IN THE MATTER OF THE GUARDIANSHIP OF D.N., A MINOR.

Juvenile and Domestic Relations Court
Monmouth County

April 8, 1983.

*Brenda T. Lewis,* Deputy Attorney General, for the State (*Irwin I. Kimmelman,* Attorney General of New Jersey).

*David J. Popiel* for defendants.

*Norma J. Rosenbloom,* Law Guardian.

STAMELMAN, J.J.D.R.C.

This matter involves the role of the Division of Youth and Family Services (DYFS) and the Department of Mental Retardation (DMR) in an application made by DYFS for termination of parental rights of parents who are mentally retarded. There is no reported case in New Jersey dealing with termination of parental rights of mentally retarded parents. This opinion supplements an oral opinion given on April 8, 1983.

The mother is D.N., age 32, and the father is R.G., age 23. D.N. has been under the care of DMR since mid-December 1981.

R.G. has been under the care of DMR since 1978. They have been living together since December 1980 in an apartment in Long Branch under the Community Living Program sponsored by DMR.

DYFS received a referral regarding D.N. from the Workshop Opportunity Center on August 13, 1981. The parents had been attending a vocational training program at the workshop. The caseworker at the workshop recognized that D.N. was in need of prenatal care and that services would also be required to care for the child after birth.

The child, baby Diane, was born on November 18, 1981. DYFS had prepared for the care of the child by arranging for home health aides on a 24-hour basis for the first week and thereafter on an eight-hour daily basis until December 24, 1981. The homemakers gave instructions to D.N. regarding care, feeding and bathing of the baby. In addition, DYFS arranged for a Public Health nurse to come to the home two to three times a week from November 24, 1981 to January 4, 1982. The DYFS caseworker had contact with D.N. almost every day. She visited regularly to assure that the child was getting proper care and that D.N. was receiving instructions for the care of the baby.

After December 24, 1981 when the services of the home health aides stopped, the parents had difficulty meeting the feeding schedule. The DYFS caseworker became concerned that the baby was not getting enough formula. A medical checkup conducted on January 4, 1982 revealed that instead of gaining weight she had lost six grams since its prior medical checkup on December 15, 1981. The baby was then admitted to the hospital for three days.

Because DYFS concluded that the baby was not getting proper care it asked the parents to sign a voluntary foster care agreement. The DYFS caseworker had obtained approval for the parents to sign the agreement from the DMR caseworker, the caseworker from Community Workshop, and from R.G.'s father. The agreement was signed on January 7, 1982.

On January 17, 1982, the baby was placed in a foster home and has remained there ever since. Visitation was arranged for the parents every two weeks beginning in February 1982.

DYFS prepared and DMR approved service contracts which provided that DMR would arrange tutors for the parents to develop their parental skills and improve their life skills. These contracts were signed on March 24, May 6 and June 16, 1982. Each provided for a short-term goal to increase visits, and a long-term goal for return of the child.

Because DYFS concluded that no significant progress had been made towards achieving the service contract objectives, the case was transferred to the Adoption Resource Center on August 25, 1982. DYFS subsequently filed this complaint for termination of parental rights on October 25, 1982. Visitation continued at the parents' apartment every two weeks.

Dr. Bernard Loigman testified as an expert for DYFS. He has been a Clinical Psychologist for 27 years and is licensed in New Jersey. He has had experience in the field of mental retardation. One-half of his practice is in the area of family dynamics. Mary Jane Kirkpatrick testified as an expert for defendants. She has a master's degree in Clinical Psychology and is licensed in Pennsylvania. She has had 13 years of experience and since 1974 has been involved with therapy for children and adults. She has also worked with the mentally retarded.

Both experts agreed that D.N. is not presently able to fulfill her parental role and that she will not be able to do so in the future. They also agreed that she was classified as moderately retarded and has an IQ of 49, and that R.G. was mildly retarded and has an IQ of 62. They further agreed that the baby Diane is a normal well-adjusted, happy child.

Dr. Loigman found R.G. to be sincere in his concern for the child, but that he lacked the emotional and intellectual resources required for parenting. He found his insight to be limited and his judgment impaired. He stated that R.G. must apply all of

his energies to his own functioning on a daily basis. Dr. Loigman also found that psychological bonding had been established between the child and her foster parents. In his opinion, defendants considered together could not meet the minimum levels of care needed for the child. He found that D.N. did not have the capacity to meet her parental responsibility and that R.G. could do routine things but had no potential for emotional support or intellectual stimulation. He concluded that if the child were returned to the parents the home environment would affect her intellectual functioning in that she would stop learning and would not try to achieve.

Miss Kirkpatrick could not give a recommendation as to the issue of termination but suggested that the court delay its decision. She suggested that another evaluation be made to determine if the parents have the potential for adequate parenting. She testified that there was a "possibility" that R.G. would be able to assume his parental role, but that it would take approximately six to ten months to make this determination.

The mental illness of a parent which affects his ability to carry out his parental responsibilities can be a basis for termination of parental rights. *Guardianship of R.G. & F.,* 155 *N.J.Super.* 186 (App.Div.1977); *In re William, Susan and Joseph,* R.I., 448 *A.2d* 1250 (Sup.Ct.1982).

The test for termination of parental rights has been set forth in the case of *In re Guardianship of J. and E. v. M. and F.,* 157 *N.J.Super.* 478, 489–490 (App.Div.1978), certif. den. 77 *N.J.* 490 (1978), where the court said:

> [T]he parental rights of a nonconsenting natural parent may only be severed when the petitioner for guardianship establishes by clear and convincing evidence "very substantial neglect of both parental duties and claims, with no reasonable expectation of any reversal of that conduct in the near future," by which the trier of the facts is convinced that the child's best interests will be substantially prejudiced by way of impairment to his mental or psychological health if he is permitted to remain with his parents or if his custody is to be returned to the natural parents within the near future.

In the current case, DYFS has established by "clear and convincing" evidence that the parents are unable to care for their child. DMR had arranged for tutors for the parents to improve their parental and life skills. The parents met with their tutors during the period from January 1982 to date for approximately two hours a day three times a week. In spite of this tutoring program the parents are not able to assume their parental responsibilities, and there is no reasonable expectation that they will be able to do so in the near future. Defendants asked court to evaluate R.G. as the primary parent; however, it is not realistic to evaluate the home environment without reviewing the potential for both parents. *In re Guardianship of R.G. & F., supra,* 155 *N.J.Super.* at 195. Defendants were living together and it is their intention to continue to live together. In spite of their good intentions they are unable to create a home environment that can give the support necessary to meet the emotional and physical needs of the growing child. There is no evidence that defendants can get any physical or moral support from their families. The father of R.G. has refused to offer his home for them to live or to give any help for the care of the child.

Baby Diane has only known the foster parents as her parents. She refers to them as father and mother. I find that psychological bonding has been established. It would be psychologically detrimental to remove her from an existing secure environment. Her learning potential and achievement levels would be impaired if she were removed and returned to her natural parents. See *J.R. Guardianship,* 174 *N.J.Super.* 211, 223–225 (App.Div. 1980), certif. den. 85 *N.J.* 102 (1980).

Termination of parental rights of a mentally retarded mother regarding one of her two children was granted in the case of *In the Interest of Wardle,* 207 *N.W.2d* 554 (Sup.Ct. Iowa 1973). The facts are similar to those in the instant case. There the Court found that evidence had established that reasonable ef-

forts had failed to correct the conditions leading to the termination of the parental relationship. The mother was 26 years old and had an IQ of 60. Her son had lived with her for about 18 months out of his first 23 months of life. He had been removed because of the mother's inability to care for his needs. The Court further found that there was no reasonable probability that the conditions which led to the placement of the child in the foster home would be corrected in the future. It concluded that termination was appropriate.

In the case at hand, DMR contends that DYFS should provide fulltime supervision to assist the parents in caring for the child. This would require 24-hour supervision which would be an unreasonable obligation for DYFS to assume.

The problem that the court faces in weighing the rights of the child versus the rights of the parents is best expressed in *In re J.R. Guardianship, supra,* 174 *N.J.Super.* at 224, where the court said, "[t]here can be no solution satisfactory to all in this kind of case. Justice to both mother and child, the desired objective, can only rarely be attained where, as here, the best interest of one is only achieved at the expense of the other. Where courts are forced to choose between a parent's right and a child's welfare, they choose the child by virtue of their responsibility as *parens patriae* of all minor children, to protect them from harm."

The court understands the desire of the parents for the child to be returned, but there is no probable expectation of change in the ability of the parents to assume the parental responsibilities. Since the foster parents have provided a stable and secure environment for the child it would be prejudicial to her mental development if she were removed from that environment. The best interests of Baby Diane requires termination of defendants' parental rights.

DYFS shall submit an appropriate order.