782 A.2d 458 (2001)
344 N.J. Super. 418
NEW JERSEY DIVISION OF YOUTH AND FAMILY SERVICES, Plaintiff-Respondent,
v.
A.G., Defendant-Appellant,
and
R.L., Defendant.
In the Matter of the Guardianship of R.G.L., a Minor.
Superior Court of New Jersey, Appellate Division.
Argued telephonically September 12, 2001.
Decided October 18, 2001.
*461 Lawrence R. Jones, Toms River, argued the cause for appellant.
*462 Stephanie S. Anatale, Deputy Attorney General, argued the cause for respondent (John J. Farmer, Attorney General, attorney; Michael Haas, Assistant Attorney General, of counsel; Ms. Anatale, on the brief).
Joyce L. Maraziti, Manasquan, argued the cause for the Law Guardian (Peter A. Garcia, Acting Public Defender, attorney; Ms. Maraziti, on the brief).
Before Judges CUFF, WECKER and WINKELSTEIN. *459
*460 The opinion of the court was delivered by WINKELSTEIN, J.A.D.
A.G. and R.L. have lengthy histories of mental illness which have prevented them from raising their son R.G.L. since his birth. A.G., the child's mother, appeals the December 7, 2000 order of the trial court terminating parental rights to her two-year, seven-months-old child. Following a three-day trial, the trial court concluded that A.G. was not capable of caring for R.G.L. The parental rights of the child's father, R.L., were also terminated, but R.L. has not appealed. The trial court also ordered the Division of Youth and Family Services (the Division) to proceed with the child's adoption by his foster parents, with whom he has lived since he was approximately four weeks old. The question in this case is whether her psychiatric disability renders A.G. incapable of caring for her child. We agree with the trial court that A.G. is not capable of caring for R.G.L. and affirm.
I
A.G. was first diagnosed with a mental illness in 1983, at age twenty-two, when she threatened to jump off a building. She was admitted to Elizabeth General Hospital's psychiatric unit, the first of four admissions in 1983-1984. In 1985, she spent a month at Marlboro Psychiatric Hospital. In 1986, her mental illness qualified her for disability benefits. Between 1987 and 1998, she received outpatient treatment and attended medication management groups on a regular basis. She was also admitted to a psychiatric facility for ten days in 1997. At the end of January 1998, prior to becoming pregnant with R.G.L., she was admitted to a psychiatric facility for suicidal ideations; she had threatened to cut her wrists. At the end of March 1998, she presented at the Carrier Clinic, where she was diagnosed with and treated for "schizophrenia, paranoid type." At that time she was seven weeks pregnant. Evaluation notes at Carrier disclose that earlier that month, she was "taken off" her medication because she was pregnant.
In late August and early September 1998, A.G. visited Kimball Medical Center for pre-natal care. After seven months without her medication, her physical and mental conditions were compromised. At an appointment on August 28, 1998, she complained that she needed a wheelchair because she was unable to do "anything now that [she was] pregnant," such as walking and cooking.
In September 1998, A.G. and R.L. were visited in their home by a social worker from Kimball Medical Center's Psychiatric Evaluation Screening Service who was accompanied by two police officers, to discuss giving up the baby when he was born. A.G. became upset with her visitors, was unable to verbally respond, and communicated only in writing. A.G.'s emotional state was so compromised at that time that she visited the emergency room of a local hospital each evening for the next five days. Subsequently, A.G. requested in patient care at Shoreline Hospital, and was admitted some time in late September.
*463 On October 1, 1998 she was committed to Ancora Psychiatric Hospital, where she was remedicated and treated until October 24, 1998. During her stay at Ancora, she was briefly admitted to Kennedy Memorial Hospital for the birth of R.G.L. on October 14, 1998. At his birth, she requested a social worker's assistance to place him. Two Division workers told her one of her options was to voluntarily place the child in foster care for fifteen days. She and R.L. agreed. Several days later, she was discharged from Ancora on medication.
On October 28, 1998, A.G. and R.L. were asked by Division workers to agree to a six-month placement for the child. They declined. On the same day, the Division prepared an assessment which recommended that A.G. and R.L. have a one hour supervised visit with their son each week. On November 2, 1998 the Division filed a complaint seeking to retain custody of R.G.L. On November 17, 1998 R.G.L. was placed in the foster home of Mr. and Mrs. L., with whom he continues to reside.
The following day, A.G. returned to Ocean Mental Health Services for out-patient medication management. On November 19, 1998 she and R.L. presented to Division psychologist Dr. Richard Klein for mental health evaluations. Klein submitted his findings and conclusions in a report dated November 24, 1998. He described A.G. as cooperative and found her memory and sensory processes intact. He saw no evidence of hallucinations, delusions or looseness of association.
Klein reported that
[A.G.] is an extremely emotionally labile personality. There are paranoid qualities. She is unable to organize and plan because she tends [sic] to become engrossed in detail and trivia while losing sight of the overall task at hand. There is significant emotional disturbance, possibly involving psychotic processes.
Klein's overall impression was that while A.G. was within the average to high average range in intelligence, she presented as significantly emotionally disturbed. In his opinion, she was unable to parent independently, but would be able to assist in parenting if supervised by a responsible adult. He recommended supervised visitation with R.G.L.
A.G. and R.L. continued to visit R.G.L. and attended parenting classes. On December 7, 1998 the Ocean County Review Board completed a "forty-five day review" of the voluntary placement and recommended continued placement outside the home. A.G. returned to Project Anchor on January 5, 1999 attending four days per week, with the focus of therapy on anger and stress management.
Around this time, the Division attempted to find a person of A.G. and R.L.'s choice to care for R.G.L. A.G. reported that a friend, Mrs. R., had expressed an interest in helping care for R.G.L. Mrs. R. is sixty-years old and raised two sons of her own. When contacted by the Division, she expressed concern about caring for R.G.L. on a long-term basis, based upon her belief that if she provided care for more than a year, she would become "too attached" to him. Mrs. R. did not make a decision at that time.
After the Division worker spoke with her, Mrs. R. allegedly spoke to A.G. The Division received a call from a worker at the Kimball Center, reporting that A.G. appeared very upset, claiming Mrs. R. told her the State would put R.G.L. up for adoption because he is white and the State will make a lot of money on the adoption. According to Center workers, A.G. reported that the conversation with Mrs. R. caused her to experience homicidal and suicidal thoughts. A.G. further stated she would find the foster home and "steal the *464 baby back." A.G. was then hospitalized from January 15 through January 20, 1999.
On February 3, 1999 after A.G. was released from the hospital, the Division received a phone call from the parenting group at St. Francis Medical Center, who reported a plan to provide A.G. with both group and in-home counseling. This was relayed to A.G. on February 5, 1999. She stated, however, that she changed her mind and would go to Lakewood for parenting rather than attend the St. Francis counseling sessions. On February 17, 1999 St. Francis sent the Division a letter confirming that A.G. declined to have parenting classes in her home. A.G. later again changed her mind and attended parenting classes at St. Francis at least once per month through September 1999.
In March 1999 the Division contacted A.G. to determine whether Mrs. R. had reached a decision. A.G. stated that Mrs. R. was no longer interested. During that conversation, R.L. was asked if his brother could care for R.G.L. R.L. answered "no" because his brother and his wife both worked and were raising their own preteen children. The Division concluded its search for relatives and in a March 16, 1999 letter to A.G. and R.L., confirmed that neither Mrs. R., nor R.L.'s brother, were placement resources. On May 5, 1999 the Division advised A.G. and R.L. that they would need to be supervised at all times while with R.G.L. Thus, a live-in assistant would be required for R.G.L. to reside with them. They were informed that a transfer of R.G.L.'s case to the Adoption Resource Center was planned, but were given one more month to find a resource on their own.
The Division filed the complaint to terminate parental rights on July 27, 1999. Meanwhile visits between A.G., R.L. and R.G.L. continued. An August 4, 1999 order adjudicated R.G.L. "abused or neglected" as contemplated by N.J.S.A. 9:6-8.21, and extended the child's temporary placement. It was further ordered that psychiatric and bonding evaluations of the parents be undertaken. On November 23, 1999, the Ocean County Review Board completed its "twelve-month review." The Board found that continued out-of-home placement was in the child's best interest and recommended that the long-term goal be the child's adoption by his foster parents.
On December 16, 1999 at the Division's request, psychiatrist Dr. John Liccardo prepared a psychiatric evaluation of both A.G. and R.L., and a bonding evaluation of A.G. and R.L. with R.G.L. In preparing his evaluation, Liccardo reviewed the Division's legal filings and assessments, Klein's November 1998 psychological evaluations, and the documents from Ancora Psychiatric Hospital regarding A.G.'s October 1998 admission. He also interviewed A.G. for approximately one hour.
Liccardo evaluated the extent of the bond between R.G.L. and his parents. He observed that A.G. actively tried to engage the child in play, but she selected activities which were too advanced for his age. At one point, while the child played with blocks, she encouraged him to identify numbers and colors, which was beyond the capacity of a child his age. A.G. was very affectionate with the child, and while he did not reciprocate, he allowed her to repeatedly hug and kiss him. Approximately twenty minutes after the evaluation started, A.G. left the room because she was too warm. While she was gone, the child was somewhat distressed, and R.L. "appeared to be at a loss as to what to do to comfort his son." A.G. rejoined them and started to play with R.G.L., but by that time the child was "disinterested." A.G., believing her son wanted to rejoin his *465 foster parents, mentioned this to R.L., and they decided to end the visit early.
Liccardo concluded that neither A.G. nor R.L., either together or independently, could provide minimally adequate parenting on a consistent basis for R.G.L. He concluded R.G.L.
has no emotional attachment/bond to his biological parents and was basically uncomfortable/distressed through most of the hour evaluation. If this boy were to be placed with them [they] would have to have a fairly sophisticated level of parenting ability to cope with the little boy's distress at being removed from the only parents he has ever known.
Liccardo also conducted psychiatric and bonding evaluations of the foster family. He reported the child formed a "strong, positive emotional/psychological bond/attachment to his foster parents and views/relates to them as his actual parents." He found that "[i]f the boy were to be sent to live with [his natural parents] the placement would most probably be unsuccessful and DYFS would have to remove him. This additional instability could only result in more emotional damage for this youngster." Liccardo strongly recommended the child be freed for adoption by the foster parents; that it would be "in the very best interests" of R.G.L. to terminate A.G. and R.L.'s parental rights.
About the same time, Dr. Neil Lavender, a psychologist of A.G.'s choosing, performed an evaluation of A.G.'s competency to parent. He met with A.G. alone for four-and-one-half hours in November and December 1999. Lavender met with R.L. alone for one hour in December 1999 and, in February 2000, he observed A.G., R.L. and R.G.L. together for one hour. Finally, he observed R.G.L. with his foster parents for an hour in June 2000. He tested A.G. but did not review A.G.'s medical records.
Lavender noted that A.G.'s strengths, as revealed by the test, are her ability to be "active and adventurous, extroverted and outgoing." The report also details severe weaknesses, which warrant repetition in full.
Ms. [G]'s profile evidences that she possesses many vague physical symptoms. She may complain of a sense of weakness, a chronic feeling of fatigue, and have sleep disturbances. [Individuals with similar profiles] will often complain about their physical dissatisfaction in a whiny and irritable manner. They are often critical of those who try to treat them. They with similar profiles often tend to use the symptoms to avoid working, obtain public assistance, avoid responsibility and to obtain other secondary gains.
Lacking in well thought out and planned, goal directed behavior, she will often rely upon others to guide her. She tends to seek immediate gratification rather than to work for more valuable long-term goals and not benefit from her mistakes.
Individuals with similar profiles often have had or have a psychotic disorder. They may have bizarre thoughts or even hallucinations. They often feel isolated and alienated and they tend to be uninvolved. They often suffer from depression and have little self esteem.
She has strong dependency needs which cause her to rely heavily upon others. Often, she has a tendency to become angry at the very people supplying those needs.
Although [A.G.] is interested in other people and can be socially outgoing at times and she seems to have a healthy interest in others, it is sometimes difficult [for] her to form meaningful relationships. Also, [A.G.] can be somewhat self-centered and intolerant of other *466 people's shortcomings, especially when they interfere with her having her own needs met. She may also use the symptoms to manipulate others into doing things for her that she does not wish to do. She experiences a great deal of conflict over authority and a great deal of anger, apparently over "the system" failing her. She is conflicted sometimes about the many rules and requirements that she has to follow and often becomes very resentful, although she finds it hard to express this resentment. She tends to keep it inside until it finally erupts and expresses itself in belligerent and abrasive behavior. People with similar profiles have histories of stormy relationships with their families and are likely to experience marital problems.
Lavender concluded that on one hand, A.G. is "highly committed" to a relationship with the child; is "very intelligent"; and is "capable of learning quickly and grasping new information such as that gleaned from her parenting classes and books." She also showed no signs of schizophrenia or a schizoaffective disorder and she was "very in touch with reality." There were also signs of bonding between A.G. and the child. For example, she was able to calm him when he became upset. Lavender recognized, however, that R.G.L. was more bonded to the foster parents. A.G. understood that she might require additional aid in raising the child should she be granted custody. Lavender interpreted this as a sign of A.G.'s emotional maturity. On the other hand, Lavender recognized that "[i]t has only been recently that [A.G.] has showed consistent psychological stability and it is difficult to predict safely whether or not, under stressful conditions, [A.G.] will deteriorate and become a danger to [R.G.L.]." (emphasis added). The psychological tests "reveal[ed] significant disturbances in her personality which are highly atypical and are predictive of stormy family relationships." He said that while persons with psychological disturbances can make good parents, A.G.'s "testing reveals qualities which could, under certain stressful conditions, cause [A.G.] to deteriorate to such an extent that her ability to parent [R.G.L.] could be compromised."
Lavender concluded, that A.G.
presently possesses the knowledge, commitment and the energy to parent [R.G.L.]. [R.G.L.] is somewhat bonded to her but not as much as he is to [the foster mother]. It must also be considered that [A.G.] is a `fragile' individual, psychologically speaking, who does not function well under high levels of stress. She is struggling vocationally and financially as well. She will need a strong support system, with which she has frequent contact, to back her up [if] she is indeed awarded custody.
Although R.L. has not taken an appeal from the trial court decision, he and A.G. lived together and his mental condition is pertinent concerning whether he could assist A.G. in parenting R.G.L. There was evidence presented at trial that he suffers from and has been treated for depression since he was a teenager. He was first hospitalized for depression in 1980 and has been admitted to various institutions ever since. He was on Social Security Disability for about twelve years because of what he described as his "nervous breakdown" but was scheduled to be removed from the program in March 2000. His depression has been complicated by substance abuse dependency, including both alcohol and heroin, which made it difficult for Dr. Liccardo to make an accurate psychiatric diagnosis. Liccardo opined that R.L. was unable to provide minimal adequate parenting for R.G.L. on a consistent basis. Dr. Klein also rendered an opinion that *467 R.L. suffered from chronic depression involving a psychotic process and was not competent to parent independently or supervise the parenting of R.G.L. Klein's diagnosis included major depression, with psychotic features.
A trial was held before Judge Villano on July 12, 2000, October 4, 2000 and October 20, 2000. The Klein, Liccardo and Lavender reports and assessments were made available to the trial court. Lavender testified that A.G. was not then suffering from depression or showing signs of a psychosis, but could be at risk in the future should she be under considerable stress. Lavender admitted that A.G. is "more susceptible to breaking under that level of stress, for example, than somebody who didn't have her history, which is why I put in my report I think she would do good with a strong support system." He later acknowledged that A.G. had no family support.
When questioned about the extent of the bond between R.G.L. and his foster family, Lavender confirmed that the child was bonded with the foster family and would be harmed by separation from them. Lavender testified that he was not recommending that R.G.L. be returned to A.G. and R.L.
Lavender acknowledged he was not privy to the Ocean Mental Health Services report and he would be "concerned" if A.G. displayed both suicidal and homicidal ideation as recently as January 1999. He said A.G.'s explanation of her history never included homicidal ideation. Finally, Lavender was concerned that A.G. did not disclose to him her most recent hospitalization for suicidal and homicidal ideation or that she said she intended to find the foster family and steal the baby back.
In sum, while Lavender could point to A.G.'s strengths, her intelligence and motivation to be a parent, he was unable to recommend that R.G.L. be returned to her. He acknowledged that her psychiatric history made her much more likely than a person without that history to break down in the face of the stresses associated with parenting a toddler.
At trial, A.G. testified to the steps she took to prepare to parent. She read parenting books, attended parenting seminars and classes and studied child safety concepts. When questioned about the level of family support available to her and the child's father, she stated "my family, like I said, is very distant from me. They don't really accept me as part of their family." While she said her mother was a possible resource she could call for help, she admitted her mother attempted to assault her while she was pregnant. Further, she acknowledged that she could only call her on the telephone for advice because her mother would not go to her home to help. She testified that other family members were supportive, but they would be unable to provide any significant assistance.
The foster mother testified about her observations of the child's visits with the parents. Both parents appeared to love the child and were happy to see him, but had trouble keeping up with him. She testified R.G.L. had severe nightmares for approximately ten months, which subsided during a two-week period he did not visit with his biological parents. The Division worker explained that the family was provided weekly visitation and parenting skill classes and no relatives could be found to care for the child. She said the mother had seen the child approximately one hour per week, but R.G.L. never visited his parents in their home.
II
When a child is voluntarily placed in the custody of the Division, before *468 providing foster care services, the Division must determine whether the child's welfare is endangered and whether the needs of the child cannot be met either through financial assistance or placement with the family or friends. In re Guardianship of J.C., 129 N.J. 1, 7, 608 A.2d 1312 (1992); N.J.S.A. 30:4C-11. Once a child is placed in foster care, reasonable efforts are required by the Division to maintain the relationship between the child and the parents in an effort to return the child to the parents whenever possible. If the efforts are unsuccessful, permanent plans are established for the child and the Division may seek approval from the court in a guardianship action. J.C., 129 N.J. at 8, 608 A.2d 1312; N.J.S.A. 30:4C-15. Termination of parental rights may occur when it is in the best interests of the child. Ibid. The Division must demonstrate that the child's "safety, health or development has been or will continue to be endangered by the parental relationship." N.J.S.A. 30:4C-15.1(a)(1).
The Court in New Jersey Div. of Youth and Family Servs. v. A.W., 103 N.J. 591, 512 A.2d 438 (1986), developed a four part test that must be met before a trial court may terminate parental rights. The court must find (1) that the child's health and development has been or will be seriously impaired by the parenting relationship; (2) the parents are unable or unwilling to eliminate the harm and delay in permanent placement will add to the harm; (3) alternatives to terminating parental rights have been thoroughly explored and exhausted, including efforts to help the parents cure the problems that led to the placement; and (4) that termination of parental rights will not do more harm than good. Id. at 604-05, 607, 608-10, 512 A.2d 438. The four criteria are not discreet and separate, but overlap with each other to provide a comprehensive standard to identify a child's best interests. In re Guardianship of K.H.O., 161 N.J. 337, 348, 736 A.2d 1246 (1999). The Division must demonstrate that the parent is "unable to eliminate the harm facing the child or is unable... to provide a safe and stable home for the child, and the delay of permanent placement will add to the harm." N.J.S.A. 30:4C-15.1(a)(2). In other words, the issue becomes whether the parent can cease causing the child harm before any delay in permanent placement becomes a harm in and of itself. J.C., 129 N.J. at 10, 608 A.2d 1312; N.J.S.A. 30:4C-15.1(a)(2).
When considering what efforts the Division has expended to assist the parent to correct the circumstances which led to the child's placement, the court must consider the alternatives to termination of parental rights and whether the Division acted reasonably. N.J.S.A. 30:4C-15.1(a)(3). The reasonableness of the Division's efforts depends on the facts in each case. In re Guardianship of D.M.H., 161 N.J. 365, 390, 736 A.2d 1261 (1999). Finally, in considering whether termination of parental rights will not do more harm than good, the court is required to consider and balance the relationship of both the parent and the child, and determine whether the child will suffer greater harm from terminating the child's ties with the natural parents than from the permanent disruption of the relationship with the foster parents. K.H.O., 161 N.J. at 355, 736 A.2d 1246. It is not a question of whether the child will be better off with the foster parents, but rather, the balancing requires "clear and convincing evidence that separating the child from his ... foster parents would cause serious and enduring emotional or psychological harm." J.C., 129 N.J. at 19, 608 A.2d 1312.
III
On December 7, 2000, the trial judge, in a lengthy, comprehensive decision *469 on the record, recognized the troubling nature of this case. She noted that the parents have never harmed, nor would they intentionally harm the child, nor have they even had an opportunity to raise the child. She stated:
* * *
Clearly neither biological parent could provide for the child or suggest any other source of care for the newborn baby. Thus, young [R.G.L.] was placed in foster care through a voluntary placement agreement. Four weeks after his birth, he was placed with his foster parents.
As stated aptly by the foster mother, L.L., when she testified, there is no one in this case that is evil. This is not a case where the child has suffered harm at the hands of his or her parents. This is not a case where there is evidence that either of the biological parents have intentionally harmed or intentionally would harm this child. This is not a case where there is evidence that the child has, in any way, suffered at the hands of the biological parents.
Rather, the Division asserts that the biological parents present a severe and substantial risk of harm to the child because they are unable to parent due to their respective conditions. There is credible expert testimony, ... to support the Division's position.
...
We agree with the trial judge that there was sufficient credible expert testimony in the record to prove by clear and convincing evidence that all four prongs of the A.W. test were satisfied.
A.
In addressing the first prong of the test, whether the child's safety, health or development will continue to be endangered by the parental relationship, the court relied upon the testimony of both Liccardo and Lavender. The judge placed more weight on Liccardo's testimony since he had the benefit of reviewing all of the medical records. The evidence supports her finding that both professionals essentially concluded that the parents, either individually or together, would be unable to protect and care for the child on a daily basis. Both the evaluations and the psychological testing revealed significant mental disturbances in A.G.'s personality which could adversely affect her ability to parent R.G.L. A.G. requires significant medication to function on a daily basis and, although at times she functions well, stressful situations are problematic. The child's safety would depend upon not only A.G.'s ability to take her medication, but also to react appropriately while medicated. During the visitation periods, she lacked understanding of the basic requirements for parenting. The trial court found the child's safety, health and development would be jeopardized upon a return to the biological parents and there is no reason to disturb that finding.
B.
In addressing the second prong of the test, whether the parents are unable or unwilling to eliminate the harm, the trial court correctly concluded that it was not a question of whether the parents were unwilling to eliminate the harm facing the child, but rather whether they were able to eliminate the harm. The trial court found that the serious and debilitating illnesses from which they suffered would prevent them from meeting the child's needs in the future. Even Lavender concluded that A.G. could deteriorate rapidly. Additionally, both Lavender and Klein opined A.G. will need full-time supervision to parent, *470 and there was no evidence that such an arrangement would be available to her. In fact, neither expert recommended that the child be permanently reunited with A.G. in the foreseeable future.
C.
The third prong of the A.W. test requires the Division to use reasonable efforts to provide services to assist the parents to correct their circumstances. The record reflects that the Division made reasonable efforts to help the parents correct the circumstances. Parenting programs, seminars and classes were provided to assist A.G. and R.L. in learning parenting skills. Initially, A.G. refused to attend the parenting services arranged by the Division. At times, she was uncooperative and resistant. Although she eventually complied, at one point, she unilaterally decided she did not want the interim counseling that the Division recommended.
Regardless, however, of the assistance provided by the Division, A.G. has never been found capable of parenting. Liccardo testified that no efforts will help her become a better parent, despite the services provided. He felt that even though well intentioned, she lacked both insight and skill as a result of her psychiatric disability.
D.
Finally, the fourth criterion is whether termination will not do more harm than good. The trial court balanced the relationship of the child with his natural parents and his foster parents. By clear and convincing evidence, Judge Villano concluded that R.G.L. is currently happy and well-adjusted and his relationship with his foster parents needs to be maintained. Separation from his foster parents will cause him severe emotional harm. She recognized the love A.G. and R.L. have for R.G.L., but in a thoughtful and insightful manner, she explained why that simply was not enough.
* * *
I would like to point out that very few people have testified before this Court so eloquently about their hopes and their dreams and their love for their child as [A.G.] and [R.L.]. [A.G.] herself had a very bad childhood in a lot of ways. She showed the court that she has a great deal of insight into what happened to her and her own experiences.
I believe that she has developed that insight over a lot of hard work through therapy, through reading, through thinking. She does not want young [R.G.L.] to suffer through the same problems that she experienced. She does not want him to have a lack of love and affection. She wants him to be nurtured and cared for. She is extremely empathetic to the needs of the child and the child's emotions.
But she, herself, is a very fragile individual. She is fragile emotionally. Psychologically speaking, she does not really have the ability to maintain herself under stress. She needs a support system, a strong support system. And she never had that with her parents or from her family. And that's unfortunate.
[R.L.] also was not provided with a strong family support, although he did not have quite as difficult a time as-at least he didn't talk about it-as [A.G.] had.
I believe that they are dedicated to each other. But when times got bad, and I point to when [A.G.] is really decompensated, [R.L.] was not able to take any action. That's the frightening and difficult part. He began to decompensate.

*471 So I think they both can keep each other on a stable path for them as adults, but the focus must remain on the child and his best interests.
...
R.G.L. is completely bonded with his foster parents and there is evidence that separation from them would cause him serious and enduring emotional harm. Both Lavender and Liccardo testified that the child believed his foster family was his biological family. Keeping the child in limbo, hoping for some long term unification plan, would be a misapplication of the law. In re P.S., 315 N.J.Super. 91, 121, 716 A.2d 1171 (App.Div.1998). It is in the best interests of R.G.L. to remain with the foster family.
That the parents may be morally blameless is not sufficient to tip the scales in their favor. In re Guardianship of R.G. and F., 155 N.J.Super. 186, 194-95, 382 A.2d 654 (App.Div.1977). Although it is a factor which may be considered, R.G.L.'s safety and emotional well-being in this case depend upon him remaining with his foster parents. Liccardo concluded that if the bond with the foster parents was disrupted, the child would suffer serious, perhaps irreparable, emotional and psychological trauma. The evidence was quite clear that the child's relationship with A.G. and R.L. is limited. The judge was correct in finding that the child was happy and developing normally with the foster parents and the relationship must be maintained.
The facts in this case are not dissimilar to those presented in R.G. and F. In that case three children were voluntarily placed in foster care and when the parents demanded their return, the Division refused. Counseling and therapy were initially refused by the parents. The parents later agreed to a counseling program and the children were temporarily returned. The father subsequently requested that the children be placed in foster care due to stresses operating within the family and the children were again removed by the Division. The trial judge entered an interim order for mental evaluations of the parents. The medical testimony at the hearing disclosed that the father suffered from severe paranoid schizophrenia while the mother was diagnosed as a passive dependent inadequate personality. The experts believed that as a result of the parents' mental impairments the children would be at risk. R.G. and F. was similar to the instant case in that no physical abuse or neglect was asserted, but the parents' mental illnesses created an environment in which they were unable to adequately care for and raise the children. Id. at 194, 382 A.2d 654. As in this case, neither of the parents were morally culpable or blameworthy; it was their mental disabilities which rendered them unable to parent. In R.G. and F., Judge King stated: "The fact that the parents may be morally blameless in this unfortunate situation is not conclusive on the issue of permanent custody. Undoubtedly, their inadequacy as parents stems from their mental illness ... N.J.S.A. 30:4C-15(c) speaks to the `best interests of any child,' not the presence or absence of culpable fault on the parents' part." Id. at 194-95, 382 A.2d 654.
A.G. and R.L. find themselves similarly situated to the parents in R.G. and F.; suffering from mental disorders which adversely affect their ability to parent. Neither A.G. nor R.L. has harmed the child, nor is there any evidence to show that they would intentionally harm the child. But that is not the test. N.J.S.A. 30:4C-15.1(a) speaks not merely of whether the child's safety, health or development has been endangered by the parental relationship, or whether the parent is or has been unwilling to eliminate *472 the harm, but rather, whether the child's safety, health or development will be endangered in the future and whether the parents are or will be able to eliminate the harm. Even Lavender was unable to recommend that R.G.L. be returned to A.G. He reported that, although A.G. demonstrated consistent psychological stability, "it is difficult to predict safely whether or not, under stressful situations, (she) will deteriorate and become a danger to (R.G.L.)." Despite the good intentions of the parents, there was just no evidence in the record to show that either parent separately, or together, would have the mental status sufficient to eliminate the risk of future harm to the child. See also In re Guardianship of D.N., 190 N.J.Super. 648, 464 A.2d 1221 (J. & D.R. Ct.1983) (holding that where the mother was mentally retarded and was unable to care for the child's needs without twenty-four hour supervision from the Division, sufficient grounds for termination of the mother's parental rights were demonstrated).
IV
A.G. has argued that neither she nor the father were ever provided a reasonable opportunity to demonstrate their parenting skills. At the time she gave birth to the child, her mental disability was exacerbated since she discontinued medication while pregnant so as to not harm the fetus. The child was immediately placed in foster care and she has only been able to get to know R.G.L. through one hour per week visits, which has made it virtually impossible for her to bond with the child. It is not disputed that through no fault of her own, she was required to give the child up as a newborn and has never had an opportunity to attempt to parent. We agree with the trial court, though, that the Division made reasonable efforts to correct the circumstances leading to R.G.L.'s placement. Parenting programs were established. The parents attended classes and seminars to educate them on parenting skills. Considering the mental state of the parents, there was little more the Division could reasonably have done. Still, none of the actions taken by the Division placed the parents in a position to parent without risk to R.G.L. As we previously pointed out, Liccardo said although they are well meaning, no treatment would assist A.G. or R.L. in becoming better parents, because they lack the necessary insight and skill.
V
A.G. asserts that the failure to provide her with a reasonable opportunity to reunite with the child equates to discrimination against the mentally challenged under the New Jersey Law Against Discrimination (LAD). N.J.S.A. 10:5-1 -42; N.J.S.A. 10:5-5(q). The argument, as we understand it, is that since A.G. is mentally disabled, she is entitled to a reasonable accommodation of her disability by providing her additional time and opportunity to try to bond with the child.
The goal of the LAD is the eradication of "a cancer of discrimination." Dale v. Boy Scouts of America, 160 N.J. 562, 584-85, 734 A.2d 1196 (1999) (citations omitted), rev'd on other grounds, 530 U.S. 640, 120 S.Ct. 2446, 147 L.Ed.2d 554 (2000). Although the LAD is liberally construed, id. at 585, 734 A.2d 1196, reliance upon the LAD is misplaced in the context of a termination of parental rights case. As we have just discussed, the best interests of the child is the guiding principle in determining whether parental rights should be terminated. Reliance upon the LAD would change the focus of the termination case from the best interests of the child to the rights of the parent.
*473 Although no case directly addresses this issue under the LAD, the issue has been raised with respect to the Americans With Disability Act (ADA), 42 U.S.C.A., §§ 12101 to -12213 (2000). The majority of the courts that have considered the issue have concluded that the ADA does not provide a defense to a termination of parental rights proceeding. See J.T. v. Arkansas Dep't of Human Servs., 329 Ark. 243, 947 S.W.2d 761 (1997); In re B.S., 166 Vt. 345, 693 A.2d 716 (1997); People ex rel. T.B., 12 P.3d 1221 (Colo.Ct.App.2000); In re Terry, 240 Mich.App. 14, 610 N.W.2d 563 (2000); In re Antony B., 54 Conn.App. 463, 735 A.2d 893 (1999); In re A.P., 728 A.2d 375 (Pa.Super.Ct.1999); Louisiana ex rel. B.K.F., 704 So.2d 314 (La.Ct.App. 1997); Stone v. Daviess County Div. of Children and Family Servs., 656 N.E.2d 824 (Ind.Ct.App.1995); In re Torrance, 187 Wis.2d 10, 522 N.W.2d 243 (Ct.App. 1994). The courts have reasoned that to allow the provisions of the ADA to constitute a defense to a termination proceeding would improperly elevate the rights of the parent above those of the child. People ex rel. T.B., 12 P.3d at 1224 (citing In re B.S., 693 A.2d at 721).
We agree. The fact that A.G. suffers from a mental disorder should not distract us from determining the best interests of the child. Moreover, A.G.'s mental status and resultant limitations are indirectly addressed by the Division's efforts to provide services to help the parents correct the circumstances which led to R.G.L.'s placement outside the home and consider the alternatives to termination of her parental rights. See N.J.S.A. 30:4C-15.1(a)(3). The Division's efforts in providing classes and parenting programs must by their very nature take into consideration the abilities and mental conditions of the parents. Here, the Division made reasonable efforts under the circumstances to accommodate A.G.'s disabilities, but those efforts did not bear fruit.
VI
The scope of our review in a non jury case is to decide whether the findings made could reasonably have been reached on substantial credible evidence present in the record when considering the proofs as a whole, giving due regard to the opportunity of the trial judge to determine credibility. Rova Farms Resort, Inc. v. Investors Ins. Co. of Am., 65 N.J. 474, 484, 323 A.2d 495 (1974). We find the trial judge's evaluation of the evidence was fully supported by the credible evidence in the record. She applied the correct legal standards as set forth in New Jersey Div. of Youth and Family Servs. v. A.W., codified at N.J.S.A. 30:4C-15.1(a). We have carefully reviewed the record and conclude that the Division has proven by clear and convincing evidence that termination of A.G.'s parental rights was in the best interests of R.G.L.
Affirmed.