# RECORD IMPOUNDED

**NOT FOR PUBLICATION WITHOUT THE**
**APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-1621-16T3

NEW JERSEY DIVISION OF CHILD
PROTECTION AND PERMANENCY,

    Plaintiff-Respondent,

v.

D.B., SR.,

    Defendant-Appellant,

and

C.B.,

    Defendant.

_____

IN THE MATTER OF THE GUARDIANSHIP OF
W.I.B. and D.B., JR.,

    Minors.

_____

        Argued October 11, 2017 — Decided November 13, 2017

        Before Judges Yannotti, Carroll and Leone.

        On appeal from Superior Court of New Jersey, Chancery Division, Family Part, Morris County, Docket No. FG-14-0016-16.

Mark E. Kleiman, Designated Counsel, argued the cause for appellant (Joseph E. Krakora, Public Defender, attorney; Mr. Kleiman, on the briefs).

Chanel J. Van Dyke, Deputy Attorney General, argued the cause for respondent (Christopher S. Porrino, Attorney General, attorney; Jason W. Rockwell, Assistant Attorney General, of counsel; Ms. Van Dyke, on the brief).

Linda Vele Alexander, Designated Counsel, argued the cause for minors (Joseph E. Krakora, Public Defender, Law Guardian, attorney; Ms. Vele Alexander, on the brief).

PER CURIAM

D.B., Sr. appeals from an order entered by the Family Part on December 1, 2016, which terminated his parental rights to two minor children, W.I.B. and D.B., Jr.[1] On appeal, D.B. argues that the Division of Child Protection and Permanency (Division) failed to establish with clear and convincing evidence all of the criteria in N.J.S.A. 30:4C-15.1(a) for termination of his parental rights. For the reasons that follow, we reject these arguments and affirm.

I.

We briefly summarize the relevant facts and procedural history. In February 2009, while he was married to A.B., D.B. met C.B. on-line. Several months later, he moved in with C.B. and her

---

[1] We use initials for the parents and others in order to protect their identities, and hereinafter refer to D.B., Sr. as D.B., D.B., Jr. as D.J., and W.I.B. as W.B.

three children, K.C., H.R., and D.D. At that time, D.B. was married to A.B. In May 2010, C.B. gave birth to W.B. She was D.B. and C.B.'s first child. D.B. divorced A.B., and in December 2010, married C.B. D.J. was their second child. He was born in September 2013. D.B. has two other children. The Division's involvement with C.B. and her family began in August 2005, when the Division removed K.C. and H.R. from her care. These children were later returned to C.B.

In 2009, shortly after D.B. moved in with C.B., the Division began to receive reports that the home was filthy, and that D.B. and C.B. had not been parenting the children properly. The Division opened a case file and began to provide services to the family. In November 2011, the Division referred D.B., C.B., W.B., and D.J. for services including Family Preservation Services (FPS) and psychological evaluations. By the end of 2011, C.B. and the children had participated in FPS's programs, and there was some improvement to the cleanliness of the home and the children, but FPS recommended more intensive services.

In January 2012, the Center for Evaluation and Counseling (CEC) performed forensic psychological evaluations and concluded that home-based family counseling was necessary to address D.B. and C.B.'s inadequate parenting skills. CEC also found that individual psychotherapy was required for the parents and two of

A-1621-16T3

the children, K.C. and H.R. The CEC noted that D.B. had not accepted responsibility for the conditions that led to the Division's involvement with the family, citing his busy work schedule, participation in the National Guard, and general lack of knowledge about what went on in the home. Throughout the remainder of 2012, the Division continued to provide services to the family, including rental assistance, referral to a food pantry, and in-home services.

In January 2013, one of the Division's workers arrived unannounced at D.B. and C.B.'s home. While there, the worker noted, among other things, piles of clothes on the sofas and floor, cat litter scattered throughout the house, a strong odor of cat feces, inadequate heat on the second floor, three cats eating cat food out of cans on the kitchen table, and dishes piled high in the sink. The worker reported that the conditions in the home were chaotic.

In June 2013, another Division worker made an unannounced visit to the home. The worker noted that there were dirty clothes throughout, and the sink was overflowing with dirty dishes. The worker then witnessed W.B. climb into a crib. According to the worker, W.B. was lying flat on her back. She had her pants down around her ankles and a vibrating device against her vagina.

A-1621-16T3

The worker reported that W.B. sometimes slept in her parents' room. The worker indicated that C.B. had disclosed that she and D.B. sometimes used "sex toys" and together they have had sex with a third person. C.B. claimed, however, that the children were not at home during those times. The Division ultimately found that the vibrator W.B. was seen using on her private area was C.B.'s back massager.

In April 2014, the Division received an anonymous call stating that C.B.'s eldest child, K.C., who was then eleven years old, told the caller she had been left at home to babysit the other children, who were five months to seven years old. One of the Division's workers made an unannounced visit to the home and found D.B. with the children. D.B. told the worker that he would never leave an eleven-year-old child alone to care for the other children, although other witnesses disputed D.B.'s assertion.

In June 2013, while C.B. was pregnant with D.J., D.B. met I.S. online. As we noted previously, D.J. was born in September 2013. Shortly after D.J. was born, the Division visited the home and found that it was infested with bedbugs. The Division paid the extermination costs and purchased new beds and sofas for the family. By December 2013, the Division considered the conditions in the home to be marginally improved.

A-1621-16T3

In March 2014, D.B. met I.S. in Boston for their first in-person meeting. When D.B. returned from Boston, he began to end his relationship with C.B. At some point, K.C. was sent to stay with a relative in Pennsylvania. D.B. decided that I.S. should move in to help C.B. care for the children. He drove with W.B. to North Carolina to pick up I.S., but C.B. did not agree with his plan and called the police. She insisted that D.B. return with W.B.

In May 2014, C.B. obtained a temporary restraining order (TRO) against D.B., claiming that he had abused her emotionally and verbally. After C.B. agreed to allow D.B. to return to the home, the TRO was dismissed. In June 2014, D.B. moved to North Carolina. He told the Division he intended to surrender his parental rights to his children, and he would not return to New Jersey unless C.B. permitted I.S. to reside in the family home.

Later that month, the Division removed W.B., D.J., and the other children after a worker found them dirty, hungry, and covered with insect bites. At the time, the children were apparently staying with their elderly grandmother at her home. The Division's worker observed the children outside, playing on a strip of grass, without adult supervision.

On June 16, 2014, the trial court granted the Division's application for immediate custody, care and supervision of the

children. Shortly thereafter, the Division placed D.J. in a resource home with Mr. and Mrs. P. Several months later, W.B. was placed with Mr. and Mrs. P. C.B.'s other children were also placed in resource homes.

In August 2014, the CEC issued a report recommending that the Division pursue alternate placements for the children due to "the severity and chronicity of [D.B. and C.B.'s] neglectful parenting . . . ." The August 2014 report stated that visitation with both parents should be supervised, but D.B.'s visits should be supervised therapeutically due to his reported anger-management issues.

In December 2014, the CEC issued another report, which noted that D.B. recognized the need for alternative housing to begin reunification, but he had made little progress to secure such housing. By January 2015, D.B. was living in a trailer in North Carolina with I.S. That same month, the CEC evaluated I.S. and recommended that she be included in D.B.'s visits with his children because she was part of D.B.'s reunification plan. The CEC also recommended that I.S. receive individual psychotherapy because she had been sexually abused in the past.

In March 2015, the trial court suspended D.B.'s visitation after W.B. made a comment to her foster parents indicating D.B. may have sexually abused her. The Division investigated the report

and determined the allegation of sexual abuse was unfounded, but found that D.B. and C.B. had exposed W.B. to sexual behaviors and materials. For this reason, the Division determined that D.B. had sexually exploited W.B. After a hearing on May 19, 2015, the court reinstated D.B.'s visits.

In June 2015, D.B. informed the Division that he and I.S. had moved back to New Jersey and were residing with his parents. In August 2015, the trial court approved the Division's permanency plan for W.B. and D.J., which called for the termination of D.B. and C.B.'s parental rights and adoption of the children by Mr. and Mrs. P. Thereafter, the Division filed its guardianship complaint.

In September 2015, D.B. acknowledged that he and C.B. had an altercation with knives and the children had been exposed to sex toys. In December 2015, Dr. Alice Nadelman conducted psychological evaluations of D.B. and I.S. She also performed bonding evaluations of D.B. and the children, and the foster parents and the children.

Among other things, Dr. Nadelman recommended that the Division seek the termination of D.B.'s parental rights. She found that D.B. was not able to provide the children with appropriate parental care at that time or in the foreseeable future; and that D.B. had not demonstrated the ability to provide the children shelter, nurturing, consistency, or stability.

In addition, Dr. Nadelman stated that W.B. displayed an "intense but ambivalent" attachment with D.B. She also stated that D.J. viewed D.B. "more like a friendly visitor than a parent." She concluded that the children would not experience severe and enduring harm if their relationships with D.B. are severed.

Dr. Nadelman further found that W.B. would likely miss D.B. if his parental rights were terminated, but the child's foster parents would be able to mitigate the harm from the loss. She stated that D.J. views his foster parents as his parents and he seemed more secure with them than with D.B. According to Dr. Nadelman, D.J. would not suffer any harm if D.B.'s parental rights are terminated.

Dr. Mark Singer, D.B's expert, performed psychological evaluations of D.B. and I.S. He also performed bonding evaluations of the children. In his report, Dr. Singer wrote that reunification with the children would require "a significant transition period" to introduce W.B. to a new family, and D.B. would require additional time for the transition. Dr. Singer stated that D.B. was not able to parent W.B. and D.J. capably at the present time, but he could do so sometime in the future if he complied with certain recommendations.

In April, May, and June 2016, the Family Part judge conducted a trial on the Division's guardianship complaint. Prior to trial,

C.B. surrendered her parental rights to W.B. and D.J. so that Mr. and Mrs. P. could adopt them. At the trial, the Division presented testimony from four caseworkers, Dr. Nadelman, and persons from the CEC, including Melissa Ciottone. D.B. testified on his own behalf, and called I.S. and Dr. Singer as witnesses.

Thereafter, the trial judge filed a forty-six page opinion, in which she found that the Division had proven by clear and convincing evidence all of the criteria in N.J.S.A. 30:4C-15.1(a) for termination of D.B.'s parental rights to W.B. and D.J. The judge memorialized her decision in an order entered on December 1, 2016. This appeal followed.

II.

On appeal, D.B. argues that the trial judge erred by finding that the Division had proven all four prongs of the best interests test in N.J.S.A. 30:4C-15.1(a) for termination of his parental rights. We disagree.

We note initially that the scope of our review in an appeal from an order terminating parental rights is limited. N.J. Div. of Youth & Family Servs. v. G.L., 191 N.J. 596, 605 (2007) (citing In re Guardianship of J.N.H., 172 N.J. 440, 472 (2002)). "Appellate courts must defer to a trial judge's findings of fact if supported by adequate, substantial, and credible evidence in the record."

Ibid. (citing In re Guardianship of J.T., 269 N.J. Super. 172, 188 (App. Div. 1993)).

The Division may petition the court for an order terminating an individual's parental rights when such relief is warranted in the "best interests of the child," and the court may grant the petition if the Division establishes the criteria in N.J.S.A. 30:4C-15.1(a) by clear and convincing evidence. In re Guardianship of K.L.F., 129 N.J. 32, 38 (1992) (citing In re J.C., 129 N.J. 1, 10-11 (1992)). "The four criteria enumerated in the best interests standard are not discrete and separate; they relate to and overlap with one another to provide a comprehensive standard that identifies a child's best interests." In re Guardianship of K.H.O., 161 N.J. 337, 348 (1999).

A. Prong One

On appeal, D.B. argues that the trial judge erred by finding that the Division established prong one of the best interests standard, which requires the Division to show that "[t]he child's safety, health or development has been or will continue to be endangered by the parental relationship." N.J.S.A. 30:4C-15.1(a)(1). D.B. contends the evidence does not show that W.B. and D.J. have been harmed by his relationship with them.

It is well established that the Division is not required to demonstrate actual harm in order to satisfy prong one. N.J. Div.

of Youth & Family Servs. v. A.G., 344 N.J. Super. 418, 440 (App. Div. 2001), certif. denied, 171 N.J. 44 (2002). Rather, the Division must show that the child's safety, health or development has been or will be endangered in the future, and whether the parent is or will be able to eliminate the harm. Ibid.

A parent's failure to provide a "permanent, safe, and stable home" engenders significant harm to the child. In re Guardianship of DMH, 161 N.J. 365, 383 (1999). Likewise, a parent's failure to provide "solicitude, nurture, and care for an extended period of time is in itself a harm that endangers the health and development of the child." Id. at 379.

In this case, the trial judge found that the Division had "unquestionably demonstrated" that D.B. placed W.B. and D.J. at substantial risk of harm. The judge noted that D.B. was aware that the Division had been involved with C.B. and her children since 2005, when the Division removed C.B.'s two oldest children from her care. The judge noted that D.B. had withheld information from the Division regarding the conditions in the home, which he knew placed the children at risk.

The judge found that D.B. had acknowledged that C.B. posed a continuing risk to his children, and he only participated minimally in family counseling from 2011 until 2014, when the Division removed the children. The judge noted that after the Division

removed the children, D.B. did nothing to secure appropriate housing and did not present an appropriate parenting plan to the Division.

The judge also pointed out that D.B. had sexually exploited W.B. and allowed C.B. to exploit her sexually. The child's therapist had testified that W.B. exhibited age-inappropriate sexual behaviors. Further, D.B. had admitted he was aware that C.B. had sex toys in the home, and that the children may have walked in on him and C.B. while they were having sex. D.B. told the CEC that he caught D.D. watching pornography on his cell phone and iPad. Moreover, C.B. had reported to the Division that D.B. often watched pornography in the family room.

The judge found that D.B. had harmed W.B. by exposing her to sexualized material and behavior, and allowing C.B. to expose the child to such inappropriate material and behavior. The judge concluded that D.B. had neglected both children while they were in his care. He had essentially abandoned the children to C.B.'s care so that he could pursue a romantic relationship with I.S. He also delayed in making provisions for the children's care when they were first placed in a resource home.

We are convinced that there is sufficient credible evidence to support the judge's findings. The record supports the judge's conclusion that the Division established prong one with clear and

convincing evidence. D.B.'s arguments to the contrary are entirely without merit.

B. Prong Two

D.B. next argues that the evidence does not support the judge's finding that the Division established prong two of the best interests test. This prong requires the Division to establish that "[t]he parent is unwilling or unable to eliminate the harm facing the child or is unable or unwilling to provide a safe and stable home for the child and the delay of permanent placement will add to the harm." N.J.S.A. 30:4C-15.1(a)(2).

Here, the trial judge noted that D.B. was willing and eager to parent the children, and he had complied with the court's orders and the Division's services. The judge found that, even so, D.B. is unable to cease causing harm to the children in the foreseeable future. The judge found Dr. Nadelman's report and testimony on these issues to be credible and persuasive.

The judge referenced Dr. Nadelman's determination that D.B. had shown little understanding that participating in services was just the first step in a process that involves learning, accepting responsibility, changing, and developing a more adaptive life and parenting skills. Dr. Nadelman opined that D.B. had not recognized his responsibility for the children's conditions of neglect, lack of adequate supervision, unclean and unhealthy environment, and

14

exposure to inappropriate persons and adult sexuality. The doctor noted that D.B. abdicated his parental responsibilities by moving to North Carolina while his family's conditions deteriorated.

In addition, Dr. Nadelman opined that D.B. had "repeatedly demonstrated poor judgment, faulty reasoning, denial of responsibility, inadequate cause and effect thinking, distortion of reality[,] and purposeful deception, none of which [D.B.] was willing to acknowledge." The doctor stated that D.B. did not demonstrate the capacity to provide safe and appropriate parental care for the children at that time or in the foreseeable future. The doctor concluded that D.B. "has not demonstrated the ability to protect his children from danger or even to recognize potential dangers to their safety and well-being."

On appeal, D.B. argues that the judge erred by relying upon Dr. Nadelman's report and testimony. He contends Dr. Nadelman was confused as to the psychological tests she administered to him, as well as the components of those tests. He asserts that Dr. Nadelman's findings lack sufficient scientific basis and therefore constitute a net opinion. He further argues that the bases for Dr. Nadelman's conclusions are spurious and inaccurate.

We are convinced, however, that there is sufficient credible evidence in the record for the judge's findings. We reject D.B.'s contention that the judge erred by accepting Dr. Nadelman's report

and testimony. An appellate court must defer to the trial court's assessment of an expert's testimony because the trial court is in a better position "to evaluate the witness' credibility, qualifications, and the weight to be accorded to [the expert's] testimony." DMH, supra, 161 N.J. at 382. We see no reason to second-guess the judge's assessment and evaluation of Dr. Nadelman's report and testimony.

We therefore conclude that the record supports the judge's determination that D.B. is unable or unwilling to eliminate the harm to the children, and a delay in permanent placement will cause further harm. The record supports the judge's determination that the Division had established prong two by clear and convincing evidence.

C. Prong Three

D.B. argues that the Division failed to establish prong three of the best interests test, which requires that it show it "made reasonable efforts to provide services to help the parent[s] correct the circumstances which led to the child's placement outside the home and the court considered alternatives to termination of parental rights . . . [.]" N.J.S.A. 30:4C-15.1(a)(3).

On appeal, D.B. argues that although the Division provided him with an array of services, it failed to provide him with a

formal case plan, as required by N.J.A.C. 10:133D-1.4 (recodified at N.J.A.C. 3A:12-1.4), until after the trial had already begun.[2] He contends the trial judge erred by overlooking the Division's "misfeasance" and by finding that there is no question that D.B. knew what he had to do to achieve reunification with his children. D.B. therefore argues the judge erred by finding that the Division made the reasonable efforts required by N.J.S.A. 30:4C-15.1(a)(3).

We are convinced D.B.'s arguments are without sufficient merit to warrant comment. R. 2:11-3(e)(1)(E). We note, however, that the Division provided D.B. with numerous services, including Family Team Meetings, in-home therapy, rental assistance, Christmas gifts for the children, funds for new furniture and insect extermination services, therapy, visitation, travel expenses, parenting classes, and forensic psychological evaluations and therapy.

The trial judge found that although the Division did not provide D.B. with a formal written case plan until May 2016, the caseworkers all had testified credibly that they had maintained daily communications with D.B., and he was well advised as to what

---

[2] A "case plan" is defined as "a written statement of the Division's intervention on behalf of the child, which includes identification of the problems [that] necessitate Division involvement with the family, the services or actions needed, who will accomplish or provide them, and the planned time frame for providing each service." N.J.A.C. 10:133-1.3 (recodified at N.J.A.C. 3A:11-1.3).

A-1621-16T3

was required to achieve reunification with the children. The record supports the judge's findings and her conclusion that the Division made reasonable efforts to help D.B. address the circumstances that led to the children's removal.

Accordingly, we conclude that there is sufficient credible evidence in the record to support the judge's findings on prong three. The record supports the judge's finding that the Division had established prong three with clear and convincing evidence.

D. Prong Four

D.B. contends the Division did not present clear and convincing evidence establishing prong four, which requires the Division to show that the "[t]ermination of parental rights will not do more harm than good." N.J.S.A. 30:4C-15.1(a)(4). D.B. argues that the judge erred by relying upon Dr. Nadelman's report and testimony for her findings on prong four because of the aforementioned alleged deficiencies in Dr. Nadelman's report and testimony. D.B. therefore argues that the judge's determination that the Division established prong four is not based on sufficient credible evidence.

In her opinion, the judge noted that Dr. Nadelman had performed bonding evaluations, which showed that W.B. had an "intense but ambivalent" attachment to D.B., and that D.J. was securely attached to his foster parents. Dr. Nadelman stated that

D.J. would suffer no harm if D.B.'s parental rights are terminated, and while W.B. would be sad and confused, the foster parents could mitigate any harm. Dr. Nadelman opined that the termination of D.B.'s parental rights would allow the children to retain the stability and security they now have with their resource parents.

The judge also pointed out that Dr. Nadelman had opined that the resource home was the only "safe and stable" home W.B. has had, and D.J. has been in the resource home since he was nine months old. Dr. Nadelman opined that if the children are removed, they would both experience "loss, separation reaction, and anger" towards D.B., which he would not be able to mitigate.

Dr. Nadelman noted that introducing I.S. as a "new mommy" would be an additional risk of harm and it would cause confusion. Dr. Nadelman added that D.B.'s plan to co-parent the children with I.S. would present another risk since there would be four children in the family. I.S.'s children are older, and her son had exhibited aggression and inappropriate sexual behavior.

The judge added that Dr. Nadelman found that there is a significant risk in placing W.B. in a home with an older boy, given that both of them has exhibited inappropriate sexual behavior. There also is a risk that D.B.'s relationship with I.S. would experience stress, which Dr. Nadelman said she had "every

19

reason to believe will happen due to their independent risk factors."

The judge noted that Dr. Singer had suggested that the children would not suffer undue harm if D.B. were afforded additional time to address the issues required for reunification. The judge observed, however, that although neither expert recommended immediate reunification, Dr. Singer could not opine as to the timeline for permanency for the children. The judge concluded that "[i]n balancing the equities, the children's need for permanency outweighs [D.B.'s] right to additional time to address the issues that led to the children's removal."

We are convinced that the judge did not err by giving significant weight to the children's need for permanency. We note that Dr. Nadelman found that D.B. would not be capable of parenting the children adequately in the foreseeable future, and Dr. Singer could not opine as to the time required for D.B. to become capable of parenting the children.

We conclude there is sufficient credible evidence in the record for the judge's findings on prong four. The judge properly found that the Division had presented clear and convincing evidence showing that the termination of D.B.'s parental rights will not do more harm than good.

D.B. further argues that the trial judge abused her discretion by qualifying Melissa Ciottone, D.B.'s therapist at the CEC, as an expert witness. We note that at trial, the Division asked the court to qualify Ciottone as an expert in child abuse and neglect, evaluations, and therapy based on her education and professional experience. D.B.'s attorney objected to qualifying Ciottone as an expert witness in every area except for therapy. The judge overruled the objection.

On appeal, D.B. argues that he was denied his right to due process by the admission of Ciottone's testimony about the nature and substance of his therapeutic sessions with her. He claims the Division set a trap for him. He asserts he reasonably believed that by engaging in therapy with Ciottone, he was doing what was required to regain custody of his children. He contends the Division then used his words against him at trial, without prior notice to him or his attorney.

At oral argument before us, counsel for the Division noted that D.B.'s attorney never raised this issue in the trial court. Counsel asserted that D.B. had signed an informed consent form in which he agreed to participate in therapeutic services conducted at the CEC, and the form stated that any "material obtained during these services is not privileged and may be used in a court of law

21                                                                    A-1621-16T3

or in the proceeding in which [he was] currently involved." Because this form was not part of the record, we required the Division to file a motion to supplement the record, which D.B. opposed. We granted the Division's motion.

We reject D.B.'s contention that the trial judge erred by admitting Ciottone's testimony, and that his right to due process was denied by the admission of her testimony. As noted, D.B. signed a form consenting to therapy at the CEC. In that form, D.B. indicated he understood the "material obtained" in the therapy sessions was not privileged and any such material could be used in a court of law. Thus, there is no merit to D.B.'s contention that his communications with Ciottone during the therapy sessions were privileged, or that he did not have notice that his statements could be used as evidence in the guardianship proceedings.

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION