# RECORD IMPOUNDED

**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NOS. A-0392-18T1
　　　　　　　　A-0393-18T1

NEW JERSEY DIVISION
OF CHILD PROTECTION
AND PERMANENCY,

　　　　Plaintiff-Respondent,

v.

M.J and W.L.,

　　　　Defendants-Appellants.

_____

IN THE MATTER OF THE
GUARDIANSHIP OF T.L.
and W.L., IV,

　　　　Minors.

_____

　　　　　　Submitted September 24, 2019 – Decided October 29, 2019

　　　　　　Before Judges Hoffman, Currier and Firko.

　　　　　　On appeal from the Superior Court of New Jersey, Chancery Division, Family Part, Mercer and Burlington Counties, Docket No. FG-11-0029-17.

Joseph E. Krakora, Public Defender, attorney for appellant M.J. (Kisha M. Hebbon, Designated Counsel, on the brief).

Joseph E. Krakora, Public Defender, attorney for appellant W.L. (Robyn A. Veasey, Deputy Public Defender, of counsel; James D. O'Kelly, Designated Counsel, on the briefs).

Gurbir S. Grewal, Attorney General, attorney for respondent (Melissa H. Raksa, Assistant Attorney General, of counsel; Samuel Fillman, Deputy Attorney General, on the brief).

Joseph E. Krakora, Public Defender, Law Guardian, attorney for minors (Melissa R. Vance, Assistant Deputy Public Defender, on the brief).

PER CURIAM

Defendants M.J. (Mary) and W.L. (Wade) appeal from the judgment of guardianship terminating their parental rights to T.L. (Taylor), age seven, and W.L., IV (William), age nine.[1] They contend the trial judge erred in concluding that plaintiff, Division of Child Protection and Permanency (the Division), proved by clear and convincing evidence that termination was in the children's best interests under the four-prong test set forth in N.J.S.A. 30:4C-15(a). Wade also contends the trial judge's opinion "evinced a clear animus" toward him, and

---

[1] To maintain confidentiality and for ease of reference, we refer to the parties and the children by the fictitious names used in the Division's merits brief. R. 1:38-3(d)(12).

that we should disregard information in the Law Guardian's brief about the children's wishes that does not appear in the trial record. The Division and the Law Guardian urge us to affirm the judgment of guardianship. We affirm.

I

We begin with a summary of the most pertinent trial evidence. Defendants are the biological parents of Taylor, born prematurely in March 2012, and William, born in October 2010. After her birth, Taylor experienced Methadone withdrawal and remained in the neonatal intensive care unit for one month; she has special needs, due to behavioral issues, including extreme tantrums. Defendants have no other children together.[2]

The Division's involvement with Mary began many years before the subject guardianship proceedings. Between 1999 and 2013, the Division received fourteen referrals concerning Mary and her children, alleging physical abuse, environmental neglect, educational neglect, medical neglect, lack of supervision, substance abuse and drug activity, domestic violence, inadequate food, improper hygiene, unstable housing, lack of heat and running water, and deplorable conditions in the home. None of the referrals involved Wade, and

---

[2] Mary has four older children who are not part of the guardianship litigation: Q.J., D.F., and J.F. are now adults, and C.M., a minor, is in the custody of the child's biological father.

A-0392-18T1

only one was substantiated. In 2002, the Division substantiated Mary for medical neglect, and removed her son J.F. from her custody for six months, after he sustained an unexplained arm fracture.

The Division reopened Mary's case in October 2014, upon receiving a referral alleging that Mary was leaving the children home alone, that there was no food in the home, and that she was abusing Klonopin and Xanax bought off the street. During the Division's investigation, Mary and the older children denied that Taylor and William were left home alone.

Before the Division's involvement, Mary had primary custody of Taylor and William. Although Wade did not live with Mary, he helped care for the children, visited them, and transported them to and from their child care programs. The children stayed with Wade for several months in 2013, when Mary was homeless. Though Wade told a psychologist that he was with the children "every day" before the court ordered their removal, he told the Division that he could not handle caring for both children at the same time.

In early November 2015, the Division filed a complaint for care and supervision of the children due to Mary's non-compliance with recommended services. Instead of care and supervision, on November 12, 2015, the court granted the Division custody, pursuant to N.J.S.A. 9:6-8.21 and N.J.S.A. 30:4C-

12, and ordered the children's removal from Mary. The court found the children were at risk due to "significant health concerns" resulting from their exposure to bedbugs and unsanitary living conditions in the home, and the fact that Mary dressed them inappropriately for the weather. The court also found that Mary had "unremediated substance abuse and mental health issues."

Taylor and William were placed together in a resource home. The record shows Mary was unwilling to provide any information about Wade's whereabouts. The Division eventually located Wade, who expressed interest in caring for the children; however, the Division did not place the children with him, primarily because he refused to allow an assessment of his home.

Both children's placements changed numerous times as the litigation progressed. Less than two months after the removal, the Division placed Taylor and William with a paternal aunt. A week later, she brought the children to the Mercer County courthouse and told court staff that she "does not want to deal with [the Division] and does not want to care for the children." The children remained in the aunt's care until February 18, 2016, when the Division placed them in separate resource homes.

Both children experienced problems following their removal. Taylor struggled with behavioral difficulties in placement and at child care programs,

A-0392-18T1

where she threw tantrums, banged her head against the wall, failed to follow directions, and fought with the other children. In 2016, Taylor was expelled from two child care programs due to her behavioral problems, and her resource parent requested her removal. In August 2016, Taylor made disclosures of inappropriate touching of her "privates" by her father. Wade denied the allegation, and the Division ultimately concluded the allegation of sexual abuse was not established. According to Dr. Jamie Gordon-Karp, Psy.D., who completed a psychological evaluation of Taylor in July 2017, Taylor's diagnoses include disinhibited social engagement disorder; reactive attachment disorder; attention deficit hyperactivity disorder (ADHD), combined type; and post-traumatic stress disorder (PTSD). In September 2017, the Division placed Taylor in a new resource home with a twenty-four hour support aide plus an in-home therapist.

The record indicates that William struggled with enuresis at night, that he told his resource parent "voices told him to do bad things," and that his school reported he was hitting and punching himself, talking to himself, and falling out of his chair.

At trial, the Division presented testimony from adoption supervisor LaTanya Forest and Dr. Gordon-Karp. Mary testified on her own behalf and

called Gerard Figurelli, Ph.D., as her expert. Wade neither testified nor called any witnesses.

Forest testified that Wade did not complete any of the services referred to him by the Division, and did not participate in a court-ordered psychological evaluation arranged for him during his incarceration. At the time of trial, Wade was incarcerated in prison. He told the Division that he was receiving substance abuse treatment and wanted to regain custody of the children after his release in April 2019, but did not say where he planned to live or work.

Forest explained that the Division's primary permanency plan for Taylor and William was adoption by Wade's mother, T.W., though they had not yet been placed with her. In the alternative, if T.W.'s home was not able to be licensed by the Division, then the plan for Taylor would become select home adoption and the plan for William would become adoption by his current resource parents.

On September 6, 2018, Judge Patricia Richmond delivered a comprehensive oral opinion in which she concluded that the Division had established by clear and convincing evidence the four factors of the best-interests-of-the-child standard, codified in N.J.S.A. 30:4C-15.1(a). The judge found that it was in the best interests of Taylor and William to terminate

7

defendants' parental rights, and awarded the Division guardianship of the children for all purposes, including adoption. The judge memorialized her decision in a judgment entered the same day. This appeal followed.

## II

To obtain termination of parental rights, the Division must satisfy all four prongs of the following test:

> (1) The child's safety, health or development has been or will continue to be endangered by the parental relationship;
>
> (2) The parent is unwilling or unable to eliminate the harm facing the child or is unable or unwilling to provide a safe and stable home for the child and the delay of permanent placement will add to the harm. Such harm may include evidence that separating the child from his resource family parents would cause serious and enduring emotional or psychological harm to the child;
>
> (3) The Division has made reasonable efforts to provide services to help the parent correct the circumstances which led to the child's placement outside the home and the court has considered alternatives to termination of parental rights; and
>
> (4) Termination of parental rights will not do more harm than good.
>
> [N.J.S.A. 30:4C:15.1(a).]

These four prongs are neither discrete nor separate, but overlap "to provide a

A-0392-18T1

comprehensive standard that identifies a child's best interests." N.J. Div. of Youth & Family Servs. v. F.M., 211 N.J. 420, 448 (2012) (citation omitted); In re Guardianship of K.H.O., 161 N.J. 337, 348 (1999). "The considerations involved are extremely fact sensitive and require particularized evidence that address[es] the specific circumstance in the given case." N.J. Div. of Youth & Family Servs. v. R.G., 217 N.J. 527, 554 (2014) (citation omitted) (alteration in original). The Division must prove by clear and convincing evidence all four statutory prongs. Ibid.

Our review of the Family Part judge's decision in a guardianship case is limited. R.G., 217 N.J. at 552. "[T]he trial court's factual findings should be upheld when supported by adequate, substantial, and credible evidence." Ibid. We accord deference to factual findings of the Family Part given its "superior ability to gauge the credibility of the witnesses who testify before it and because it possesses special expertise in matters related to the family." F.M., 211 N.J. at 448. We will not overturn a family court's findings unless they were "so wide of the mark that the judge was clearly mistaken." N.J. Div. of Youth & Family Servs. v. G.L., 191 N.J. 596, 605 (2007).

Mary and Wade argue that Judge Richmond erred by terminating their parental rights, asserting the Division failed to prove, by clear and convincing

A-0392-18T1

evidence, that termination was in the children's best interest. We disagree. The record contains substantial, credible evidence to support the judge's well-reasoned findings and conclusions.

A. Prongs One and Two

Prong one requires the Division to prove that "[t]he child's safety, health or development has been or will continue to be endangered by the parental relationship[.]" N.J.S.A. 30:4C-15.1(a)(1). This prong focuses on the negative effect the parent-child relationship has upon the child's safety, health, and development. In re Guardianship of K.H.O., 161 N.J. 337, 348 (1999). To satisfy prong one, the Division is not required to show that the child was physically harmed, and evidence that the child suffered psychological harm is sufficient. Matter of Guardianship of K.L.F., 129 N.J. 32, 43-44 (1992).

To satisfy prong two, the Division needed to prove, by clear and convincing evidence, that defendants are "unwilling or unable to eliminate the harm facing" Taylor and William or are "unable or unwilling to provide a safe and stable home . . . and the delay of permanent placement will add to the harm." N.J.S.A. 30:4C-15.1(a)(2). The second prong "relates to parental unfitness" and can be proven in several different ways. K.H.O., 161 N.J. at 352. For instance, the second prong is satisfied "by demonstrating that the parent has not cured the

A-0392-18T1

problems that led to the removal of the child." H.R., 431 N.J. Super. at 224. In addition, prong two can be established through evidence that the parent cannot provide a safe and stable home, and that the child will suffer substantially from a lack of stability and a permanent placement. N.J. Div. of Youth & Family Servs. v. M.M., 189 N.J. 261, 281 (2007).

"In other words, the issue becomes whether the parent can cease causing the child harm before any delay in permanent placement becomes a harm in and of itself." N.J. Div. of Youth & Family Servs. v. A.G., 344 N.J. Super. 418, 434 (App. Div. 2001). See N.J. Div. of Youth & Family Servs. v. P.P., 180 N.J. 494, 512 (2004) (holding that prong two was proven by clear and convincing evidence where the parents had "significant and longstanding substance abuse histories," repeatedly failed "to comply with [the Division's] recommendations and court orders for services[,]" had not secured stable housing, and "were not in a position to care for their children" at the time of trial though they had recently started complying with substance abuse treatment). Because they are related, evidence supporting the first prong may also support the second prong "as part of the comprehensive basis for determining the best interests of the child." In re Guardianship of DMH, 161 N.J. 365, 379 (1999).

In her opinion, Judge Richmond addressed prongs one and two together. She concluded that both Mary and Wade "completely abdicated [their] parental responsibilities" and that "[n]either parent here is willing or able to help their children and to help their children by helping themselves."

As for Mary, Judge Richmond noted her history of Division involvement and the environmental concerns in the home before the removal, her failure to complete services, and her failure to appreciate the children's need for services for their psychiatric and behavioral issues. Of particular concern was the fact that Mary "simply did not appreciate or realize the inappropriateness" of Taylor lacking proper clothing.

As for Wade, Judge Richmond emphasized that she made "no finding and . . . ha[d] no opinion about whether the allegations [of sexual abuse] are true." She noted his failure to complete services, failure to cooperate with the Division's home assessment, and failure to provide his address. The judge acknowledged that while Wade did not have the burden of proof and was not obligated to testify, his decision not to testify or present evidence "left the [c]ourt with a hole in its understanding of the family dynamic, and . . . not understanding what [Wade's] position in this is and why he takes that particular position." She concluded that Wade's "silence" in this matter "speaks volumes

12

of his lack of desire, as much as his inability to provide these children with a safe, permanent, stable home."

Mary contends that the only evidence of harm presented by the Division was that she "was not able to complete all services by the time of trial, that her home had clutter, . . . insects and rodents, and that her toddlers kept taking their clothes off while being potty trained." But contrary to her contention, the record reflects, and the court found, that Mary also continued to struggle with unremediated substance abuse and mental health issues, despite multiple treatment referrals dating back to 2013, that interfered with her ability to safely parent the children.

Both experts agreed that Mary could not safely parent the children due to her failure to successfully engage in and complete treatment for substance abuse and depression. However, Mary herself did not believe she needed treatment, despite having admitted suffering multiple drug relapses and experiencing symptoms of depression and anxiety. Her lack of insight into her own difficulties and her failure to complete necessary treatment not only endangered the children's health and safety before the removal, but would continue to endanger their health and safety going forward – particularly given their specialized needs.

A-0392-18T1

The record also shows that Mary minimized the multiple environmental concerns in her home. She told Dr. Gordon-Karp and Dr. Figurelli that she did not know why the children were removed while, at the same time, admitting that her home was unsanitary and had bedbugs, roaches, and mice. Based upon testimony from Forest and Dr. Gordon-Karp, the court found that Mary "simply did not appreciate or realize the inappropriateness" of Taylor lacking proper clothing in the presence of older males, though it was brought to her attention numerous times, or of Taylor eating cat food. All of these factors endangered the children's health and safety.

As for prong two, Mary does not contest the court's finding that she had not completed court-ordered services at the time of trial. Nevertheless, she contends that she "made tremendous progress" and that the court should have considered the difficulties she faced, including her depression, funding problems, appointment time conflicts with her work schedule, and that she had to participate in multiple services at the same time. She also points to Dr. Figurelli's testimony that she could resolve the child safety concerns if given an additional three to six months to finish services.

While Dr. Figurelli did opine that Mary could potentially remove the risk of harm to the children if given an additional three to six months to complete

substance abuse treatment, mental health treatment, parenting skills training, and to secure stable housing and adequate financial support, he also acknowledged that the Division had previously offered her all of the required services and that she had been non-compliant and "ambivalent" about making the necessary changes in her life. In addition, Dr. Gordon-Karp opined that Mary's prognosis was "not good" given that she had neither complied with nor appeared motivated to complete the necessary services in the past.

Dr. Gordon-Karp also opined that the children "have behavioral and emotional dysfunction that require a higher level of care" than Mary can provide, and that Taylor, in particular, was at risk of developing a conduct disorder absent proper care. She testified that waiting any longer for permanency would be harmful to the children and cause them to continue engaging in acting-out behaviors. Thus, the record amply supports the court's conclusion that Mary has not resolved the safety concerns that led to the children's removal from her care, and that delaying permanency any longer for Taylor and William will add to the harm they have already endured.

Wade's primary contention is that the court, in making its prong two determination, erroneously penalized him for declining to participate in a "psychosexual" evaluation with Dr. Gordon-Karp following Taylor's allegation

of sexual abuse and declining to testify at trial. He maintains that undergoing the evaluation would have violated his Fifth Amendment right against self-incrimination, and that the court wrongly "chastised" him for refusing to participate.

Although Wade refers to the evaluation as a "psychosexual" evaluation in his merits brief, Forest testified that the Division had only requested a standard psychological evaluation of Wade in connection with the guardianship proceedings, not a psychosexual evaluation. The record does not contain any court order requiring Wade to complete a psychosexual evaluation. The record does contain an order for him to submit to a psychological and bonding evaluation arranged by the Division, which he did not complete.

We conclude the judge's prong one and prong two findings and conclusions as to both Mary and Wade are supported by substantial, credible evidence.

B. Prong Three

Regarding prong three, Mary contends the Division failed to provide her "with reasonable services aimed at reunifying the family," including unsupervised visitation. In fact, the record demonstrates the Division repeatedly referred Mary to services, both before and after the removal, including substance

A-0392-18T1

abuse evaluations, substance abuse treatment, psychological and bonding evaluations, mental health treatment, individual counseling, domestic violence education, parenting skills programs, therapeutic visitation, and supervised visitation. The fact that the Division never endorsed unsupervised visitation for Mary does not negate the reasonable efforts it made to help Mary correct the circumstances which led to the children's removal. Mary's failure to complete the recommended services and make the necessary behavioral changes to ensure the children's safety, not the Division's lack of reasonable efforts, prevented her progression from supervised visitation to unsupervised visitation.

Regarding prong three, Wade contends: 1) the Division failed to make reasonable efforts to assist him with reunification; 2) the Division's failure to timely assess T.W. prevented the court from considering alternatives to termination of parental rights; and 3) the court "abdicated its responsibility to determine the permanent placement of the children." The record fails to support these contentions.

The Division did not ignore Wade before or after his incarceration. Before his incarceration, the Division asked Wade numerous times to allow an assessment of his home; however, he refused, thereby thwarting the Division's reunification efforts. The Division referred Wade to therapeutic and supervised

A-0392-18T1

visitation, a substance abuse evaluation, a psychological evaluation, and to Children's Home Society for individual counseling to address anger management and a parenting group. He was discharged for non-compliance.

During his incarceration, a caseworker visited Wade twice, gave him updates on the children during at least one of those visits, inquired about his plans for the children upon his release, and encouraged him to participate in individual counseling, anger management, and parenting skills classes if available to him at the facility.

As for Wade's contention the Division's failure to timely assess T.W. prevented the court from considering alternatives to termination, he overlooks the fact that the Division asked T.W. if she was willing to become a licensed resource parent in February 2016, and she noncommittally replied that she "would think about it." N.J.S.A. 30:4C-12.1(a) only requires the Division to assess relatives who are interested in caring for the children. We acknowledge that Mary asked the Division to assess T.W. in January 2017, and the Division did not begin its assessment until June 2017. Accepting the argument the Division should have reached out to T.W. again in January 2017, the assessment delay in this case did not prevent the court from considering alternatives to termination of parental rights when, in fact, Wade never presented any

alternatives at trial for the court to consider. He does not contend that someone other than T.W. is available to provide care for the children, or that T.W. does not wish to adopt. Thus, it was reasonable for the court to find that no alternatives to termination existed based upon the evidence in the record.

The judge's decision makes clear that she accepted the Division's primary plan of adoption by T.W. for both children – the plan that Wade supports. The judge credited Dr. Gordon-Karp's unchallenged opinion that T.W. offered the children "the best chance" at stability and permanency, "recognizes that the children have significant needs, and despite that is willing to take on the children with those needs and ensure that the children receive the help that they require."

We conclude that the record supports the trial court's finding that the Division made reasonable efforts to address the circumstances that led to the children's removal and their placement in foster care, and the Division properly considered alternatives to termination of defendants' parental rights.

C. Prong Four

To establish prong four, the Division must present clear and convincing evidence showing that "[t]ermination of parental rights will not do more harm than good." N.J.S.A. 30:4C-15.1(a)(4). "[T]he fourth prong of the best interests standard cannot require a showing that no harm will befall the child as a result

of the severing of biological ties." K.H.O., 161 N.J. at 355. Instead, the court must balance the relationships of the biological parent and the child, "and determine whether the child will suffer greater harm from terminating the child's ties with" his or her biological parent than from permanent disruption of the child's relationship with a resource parent. A.G., 344 N.J. Super. at 435 (citing K.H.O., 161 N.J. at 355).

Here, Judge Richmond found that that termination of parental rights would not do more harm than good. Citing both experts' opinions, she found that Taylor and William "are in need of permanency, stability, and safety, especially . . . with their special behavioral and emotional needs" and that neither Mary nor Wade "has demonstrated the ability to provide any of these for the children, to provide a home for them, to provide financial support, to provide any kind of stability." She added that "[n]o expert has come forward to recommend that the parental rights of either [Mary] or [Wade] not be terminated." She credited Dr. Gordon-Karp's unchallenged opinion that T.W. offered the children "the best chance" at stability and permanency and was capable of meeting the children's needs.

Mary contends that Judge Richmond's prong four conclusion was erroneous because she is bonded with the children, and because Dr. Figurelli

opined she could become ready to parent in three to six months. While the judge recognized that Mary is bonded to the children, she cited Dr. Gordon-Karp's opinion that the children are in need of permanency and "have such severe behavioral and emotional dysfunctions and require such a high level of care that it is unlikely that [Mary] can meet these needs either now or in the foreseeable future." The judge accepted Dr. Gordon-Karp's opinion that the resultant harm from severing their parental bond with Mary "can be ameliorated by living in a safe home where there is love, services provided, and some permanency." We find no error in the judge's rejection of Dr. Figurelli's contention that "it was acceptable for these children to wait another six months" for Mary to comply with substance abuse and mental health treatment. See Brown v. Brown, 348 N.J. Super. 466, 478 (App. Div. 2002) ("A trial court is free to accept or reject the testimony of either side's expert, and need not adopt the opinion of either expert in its entirety.").

As for Wade, Judge Richmond found that he too was unable to provide a safe and stable home for the children and unable to meet their specialized needs in the foreseeable future. Even before his incarceration, which presented a significant barrier to reunification at the time of trial, Wade's documented failure

to allow the Division to assess his home demonstrated that he was historically either unwilling or unable to take custody of the children.

In addition, the judge noted the absence of expert testimony pertaining to Wade due to his failure to participate in a psychological or bonding evaluation. While Wade faults Dr. Gordon-Karp for failing to opine about what harms the children would suffer if his parental rights were terminated, his refusal to participate in the psychological evaluation with her at the prison facility or a bonding evaluation prevented the expert from offering such opinions.

Wade primarily contends that the court's prong four conclusion was premature and will do more harm than good to the children since their adoption by T.W. was uncertain at the time of trial. He maintains that should the adoption by T.W. fall through, then there will be no compensable benefit to the children by terminating the parental relationship. Although the children's adoption by T.W. remained uncertain at the time of trial, that fact does not detract from or override Judge Richmond's well-reasoned determination that Mary and Wade are unable to provide appropriate care for the children in the foreseeable future.

Our Supreme Court has recognized that while "courts should consider the permanency plan presented," it need not be set in stone at the time of trial, as "there will be circumstances when the termination of parental rights must

A-0392-18T1

precede the permanency plan." N.J. Div. of Youth & Family Servs. v. A.W., 103 N.J. 591, 610-11 (1986). Thus, the judge was not required to conclusively determine the children's permanent placement at the time of trial, despite Wade's contention to the contrary. The record supports the judge's finding that terminating defendants' parental rights to Taylor and William would not do more harm than good.

Wade also contends that Judge Richmond "evinced a clear animus" toward him, "driven by her patent misunderstanding of the facts of the case," as demonstrated by several "clearly erroneous" factual findings in her oral opinion. This contention lacks merit. Although Wade disputes the judge's finding that the Division could not locate him after the children's removal from Mary in 2015, that finding is amply supported by Forest's trial testimony and the Division's records. Wade also disputes the court's findings that he had only "some relationship with the children" and would see them "on occasion" before they were removed. However, the court's findings are supported by substantial, credible evidence. The record reflects that Mary was the primary caregiver. Though he visited the children and assisted Mary at times, Wade did not live in her household.

A-0392-18T1

In addition, Wade disputes the court's finding that he did not complete any services; however, he offered no testimony or documentary evidence to show that he completed any services, either while incarcerated or elsewhere, and the trial record contains none.  Although he contends that the Division chose not to obtain his treatment records from Operation Fatherhood Training Group, a contact sheet reflects that the Division requested documentation from the program but never received a response.  At that point, the Division asked Wade to obtain proof of completion and submit it to the court himself.  He agreed to do so, but did not follow through.

The fact that Judge Richmond made findings unfavorable to Wade does not compel the conclusion that they resulted from any animus toward him.  "Bias cannot be inferred from adverse rulings against a party."  Strahan v. Strahan, 402 N.J. Super. 298, 318 (App. Div. 2008) (citing Matthews v. Deane, 196 N.J. Super. 441, 444-47 (Ch. Div. 1984).  Following our review of the record, we discern no evidence of bias in the judge's opinion.

Finally, Wade contends that the Law Guardian's representations in the brief filed on behalf of the children, asserting that William now wishes to be adopted by his resource parents, "must be disregarded" because that information was not part of the trial record.  On this point, we agree.

24

While "Law [G]uardians are obliged to make the wishes of their clients known, to make recommendations as to how a child client's desires may best be accomplished, [and] to express any concerns regarding the child's safety or well-being . . . ." N.J. Div. of Youth & Family Servs. v. Robert M., 347 N.J. Super. 44, 70 (App. Div. 2002), the scope of our review in a termination of parental rights matter "is limited to whether the trial court's decision is supported by the record as it existed at the time of trial." M.M., 189 N.J. at 278 (citing R. 2:5-4). In terminating Mary and Wade's parental rights, Judge Richmond did not consider the children's wishes, as she had no evidence before her regarding their wishes. The children did not testify at trial, nor were their wishes brought forward through expert testimony or documentary evidence. As a result, we have not considered the representations in the Law Guardian's brief concerning William's wishes. Notwithstanding the absence of evidence of the children's wishes in the trial record, Judge Richmond's decision to terminate defendants' parental rights in the children's best interests is amply supported by the substantial, credible evidence presented during trial.

Any arguments not addressed lack sufficient merit to warrant discussion in a written opinion. R. 2:11-33(e)(1)(E).

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

A-0392-18T1