# RECORD IMPOUNDED

**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-1497-18T2

NEW JERSEY DIVISION
OF CHILD PROTECTION
AND PERMANENCY,

     Plaintiff-Respondent,

v.

J.L.,

     Defendant-Appellant,

and

L.Y.,

     Defendant.

_____

IN THE MATTER OF THE
GUARDIANSHIP OF M.Y.,

     a Minor.

_____

Submitted October 15, 2019 – Decided November 7, 2019

Before Judges Sumners and Geiger.

On appeal from the Superior Court of New Jersey, Chancery Division, Family Part, Ocean County, Docket No. FG-15-0030-18.

Joseph E. Krakora, Public Defender, attorney for appellant (Robyn A. Veasey, Deputy Public Defender, of counsel; Mark Edward Kleiman, Designated Counsel, on the briefs).

Gurbir S. Grewal, Attorney General, attorney for respondent (Jane C. Schuster, Assistant Attorney General, of counsel; Nicole T. Laferriere, Deputy Attorney General, on the brief).

Joseph E. Krakora, Public Defender, Law Guardian, attorney for minor (Todd S. Wilson, Designated Counsel, on the brief).

PER CURIAM

Defendant J.L.[1] appeals from a Family Part judgment of guardianship terminating her parental rights of her now three-year-old daughter, M.Y. (Maya), following a three-day guardianship trial.[2] Maya is currently placed with her paternal grandmother, N.G. (Nia).

---

[1] We use initials and pseudonyms to protect the identity of the child. See R. 1:38-3(d)(12).

[2] Defendant L.Y. is Maya's father. He voluntarily surrendered his parental rights on October 4, 2018. He has not appealed the trial court's decision or participated in this appeal.

Plaintiff New Jersey Division of Child Protection and Permanency's (the Division) court-approved plan is for Maya's paternal grandmother to adopt her. Maya's Law Guardian supports that plan, and joins the Division in urging that we affirm the trial court's decision.

For the following reasons, we affirm the trial court's determination that the Division met its burden of proof with respect to the first two prongs of the termination of parental rights statute, N.J.S.A. 30:4C-15.1(a). We remand with respect to prongs three and four of the statute, to:

> (1) develop the trial record with more clarity as to whether [the] resource parent unequivocally, unambiguously, and unconditionally wishes to adopt the child[] in her care, regardless of the potential alternative of Kinship Legal Guardianship ("KLG"); and (2) obtain explicit findings by the trial court addressing KLG as it relates to the feasibility of adoption.
>
> [N.J. Div. of Child Prot. and Permanency v. M.M., 459 N.J. Super. 246, 252 (App. Div. 2019).]

In all other respects, we uphold the trial court's fully supported and well-reasoned decision.

## I.

We need not detail the record extensively in this opinion. We summarize only the salient facts pertinent to our discussion.

A-1497-18T2

Maya was born prematurely at thirty-one weeks gestation on August 22, 2016, and remained hospitalized for one month. Three days later, the Division received a referral from Monmouth Medical Center expressing concerns that J.L. tested positive for marijuana.

On September 1, 2016, J.L. again, along with L.Y., tested positive for marijuana. The Division opened a case for services and supervision, and required both parents to attend substance abuse evaluations. The Division also learned of J.L. and L.Y.'s history of marijuana use, L.Y.'s probation and criminal history, and that L.Y. was homeless. Neither parent completed the initial recommended substance abuse treatment.

On September 23, 2016, the hospital released Maya to J.L.; they went to J.L.'s parents' home where J.L. resided at the time. Approximately four days later, Maya returned to the hospital for over a week due to poor feeding, lethargy, and a respiratory infection.

In early November 2016, the Division received two calls from the maternal grandparents expressing their concern for Maya's well-being after J.L. moved out with Maya. In response to the second call, Division workers visited J.L. and L.Y. at a motel they were staying at with Maya. Due to concerns of suspected domestic violence and marijuana use in Maya's presence, the Division

workers transported the family to a local Division office. After unsuccessfully attempting to implement a safety protection plan, the Division workers conducted an emergency removal of Maya on November 9, 2016, and transported her to a resource home, placing her with Lisa Studer-Haywood. Five days later, the Division filed a complaint for custody, which the court granted that same day. The court ordered J.L. and L.Y. to submit random urine screenings and attend updated substance abuse evaluations. The Division arranged visits for both parents. After attending her first visit on December 1, 2016, J.L. reported she moved to California with L.Y. to "start over." The Division was not able to locate either parent for three months. Meanwhile, in January 2017, Studer-Haywood sought early intervention for Maya due to developmental concerns.

In February 2017, J.L. appeared at a court hearing concerning Maya's custody. Thereafter, the Division arranged visitation, which J.L. consistently attended. Beginning in April 2017, Nia began supervising visits on weekends (at the time, Nia was moving back and forth between New Jersey and Florida). During that time, J.L. completed an outpatient substance abuse program and produced negative urine screens until July 2017, when she again tested positive

for marijuana. Meanwhile, the Division learned L.Y. was extradited from California to New Jersey, where he remained incarcerated until August 2017.

On May 24, 2017, Lori Lessin, Ph.D., conducted a psychological evaluation of J.L. Dr. Lessin noted J.L. "presented as immature and self-absorbed, and there was no indication that she is currently able to prioritize her daughter's needs over her own." Dr. Lessin recommended substance abuse treatment, individual counseling, supervised visitation, and development of a long-term housing plan.

In September 2017, J.L. was discharged from treatment and counseling for noncompliance. On October 20, 2017, the court accepted the Division's permanency plan for Maya—termination of parental rights followed by adoption. In November 2017, the Division filed a complaint for guardianship of Maya.

On May 3, 2018, Dr. Lessin re-evaluated J.L. and conducted a bonding evaluation between J.L. and Maya. In July 2018, J.L. completed a substance abuse program, but subsequently tested positive for marijuana during the months leading up to the guardianship trial.

In sum, Maya has been placed with a resource parent since she was seventy-nine days old. Of those first seventy-nine days, she was hospitalized for forty-one days. The guardianship trial commenced in October 2018.

On the first day of trial, the court accepted L.Y.'s surrender of his parental rights. Division workers Jaime Rimer and Alyson Simak testified for the Division. Rimer testified regarding the Division's initial investigation, Maya's emergency removal, and the unsuccessful reunification attempts that led up to the October 2017 permanency hearing. Rimer also noted J.L. does not necessarily understand Maya's special needs, and that J.L. "felt [Maya's] delays were the result of being premature and that she would catch up."

Simak described the Division's unsuccessful efforts to provide J.L. with treatment and counseling, noting J.L. tested positive for marijuana right before trial. Further, Simak related J.L. consistently visited Maya but expressed concern that J.L. did not fully understand Maya's condition, citing J.L.'s remarks that she would get Maya to walk and eat solid foods.

Additionally, Simak described Maya's disabilities. She stated Maya could not walk, talk, sit up, or roll over. She further explained Maya's need for therapy, special equipment, and services which Maya will likely need for the rest of her life. Simak noted J.L. missed some of Maya's doctor appointments

and that J.L. could not describe how she would care for Maya. Finally, Simak indicated Nia was a suitable caretaker for Maya based on her experience caring for children with special needs.

Studer-Haywood testified about her time as Maya's resource parent. Studer-Haywood noted she sought early intervention for Maya when she was about four months old due to developmental concerns. Thereafter, Maya was provided with physical, occupational, and speech therapies. Additionally, Maya sees multiple specialists including a gastroenterologist, ophthalmologist, neurologist, and pediatrician. Studer-Haywood indicated Mia cannot talk other than to say "hi" or "ouch."

Dr. Lessin testified regarding her psychological evaluations of J.L. and the bonding evaluation of J.L. and Maya. In concluding J.L. "would not be able to independently parent" Maya and that "termination of her rights would be appropriate," Dr. Lessin cited J.L.'s failure to establish long-term stability, J.L.'s relationship with L.Y., and J.L.'s lack of understanding concerning Maya's special needs. Regarding Maya's special needs, Dr. Lessin noted such lack of understanding "could be life threatening." Dr. Lessin also testified that the significance of the bonding evaluation in this matter is different due to Maya's condition. Consequently, Dr. Lessin's bonding evaluation focused more on

8

J.L.'s ability to care for Maya's special needs. Dr. Lessin noted the importance of permanency for Maya who needed assurance her special needs would be met; otherwise Maya may suffer negative reactions. Finally, Dr. Lessin testified Maya would not suffer irreparable harm from severing her relationship with J.L.

Maya's nurse at the pediatric daycare program, Lisa Fitzpatrick, testified about Maya's special needs. Fitzpatrick described the difficulty of feeding Maya because she has "choking and gagging issues." Fitzpatrick noted Maya's need for ankle and foot braces. Maya's physical therapist at the daycare program, Kelly Ann Cary, also testified, noting Maya will likely need physical therapy for the rest of her life.

Nia testified about her experience caring for medically fragile children for over twelve years, and her willingness to adopt Maya. While supervising visits, she noted J.L. would get frustrated when caring for Maya and would at times give up. The paternal grandmother testified J.L. could not appropriately care for Maya's special needs, citing conversations where J.L. told her Maya's condition was not serious and only temporary. The paternal grandmother said she intended to live in North Carolina following adoption.

Finally, J.L. testified on her own behalf. She acknowledged her relapse after completing substance abuse treatment. She indicated she understood

9

Maya's medical condition but believed Maya would get better. On cross-examination she acknowledged she has never had to care for Maya on a daily basis and has no experience meeting Maya's special needs.

The evidence at the three-day trial established Maya is diagnosed with spastic quadriplegic cerebral palsy, agenesis of corpus callosum, failure to thrive, strabismus, dysphagia, chronic constipation, gastroesophageal reflux disease, and severe developmental delays, rendering her profoundly disabled and in need of extraordinary care.

Maya has an aversion to eating, must eat a special diet, requires skilled care, multiple therapies, and will likely never walk or talk. She cannot stand without ankle and leg braces and cannot sit up except in a special chair. Her vocabulary is limited to two words. She is significantly underweight and may need a surgically emplaced feeding tube. She has severe difficulty swallowing and is at risk of aspirating food. She is also at risk for scoliosis and hip displacement, has no fine motor skills, and cannot pick up or hold anything. Her hands are chronically fisted.

On November 15, 2018, the trial court issued a lengthy oral decision recounting the testimony in detail. The court found the Division workers, Dr. Lessin, and the daycare workers to be "entirely credible and reliable witnesses."

J.L. produced no expert witnesses. Her testimony did not undermine the Division's proofs. The court found the paternal grandmother to be a "very impressive" regarding her experience and ability to care for Maya.

The trial court noted J.L. has struggled to be capable as a parent of a severely disabled child. It found the evidence clearly and convincingly demonstrated J.L. is unable to meet the child's extraordinary needs. She has little knowledge of the multiple therapies her daughter undergoes, does not fully understand her daughter's special needs, and is in denial that the limitations are permanent. She mistakenly believes her daughter will grow out of it.

Additionally, it found J.L.'s history of drug abuse well documented. She relapsed more than once after treatment, concedes she cannot care for Maya when she is using marijuana, does not have a driver's license, and has been homeless at times. At one point, she moved to California to live with L.Y. and abandoned her daughter for three months.

The trial court determined the Division proved all four prongs of N.J.S.A. 30:4C-15.1(a) by clear and convincing evidence, terminated the parental rights of J.L. and L.Y., awarded the Division guardianship of Maya, and directed it to file its complaint for adoption "as soon as possible." This appeal followed.

J.L. raises the following points:

Point I

THE TRIAL COURT'S FINDINGS WERE INCOMPLETE AND INADEQUATE TO SUSTAIN A JUDGMENT TERMINATING [J.L.'S] PARENTAL RIGHTS BY CLEAR AND CONVINCING EVIDENCE AS REQUIRED BY N.J.S.A. 30:4C-15 AND 30:4C-15.1.

A. The Trial Court Erred In Finding That [The Division] Demonstrated By Clear And Convincing Evidence That The Child's Health And Development Had Been Or Will Continue To Be Endangered By The Parental Relationship Under The First Prong.

B. The Trial Court Erred In Finding That [The Division] Demonstrated By Clear And Convincing Evidence That [J.L.] Was Unwilling Or Unable To Eliminate The Harm Facing The Child Or Is Unable Or Unwilling To Provide A Safe And Stable Home For The Children And The Delay Of Permanent Placement Will Add To The Harm Under The Second Prong.

C. The Trial Court Erred By Failing To Consider Viable Alternatives To Termination Of Parental Rights.

D. The Trial Court Erred In Finding That [The Division] Demonstrated By Clear And Convincing Evidence That Termination Of [J.L.'s] Parental Rights Will Not Do More Harm Than Good Under The Fourth Prong.

Point II

THE DECISION TO TERMINATE [J.L.'S] PARENTAL RIGHTS MUST BE REVERSED BECAUSE THE TRIAL COURT ERRONEOUSLY APPLIED A "BETTER" INTEREST OF THE CHILD STANDARD RATHER THAN THE "BEST" INTEREST OF THE CHILD STANDARD GOVERNING TITLE 30 GUARDIANSHIP CASES. (Not Raised Below)

## II.

"The scope of appellate review of a trial court's fact-finding function is limited." Cesare v. Cesare, 154 N.J. 394, 411 (1998). In general, a trial court's findings "are binding on appeal when supported by adequate, substantial, credible evidence." Id. at 412 (citing Rova Farms Resort, Inc. v. Inv'rs Ins. Co. of Am., 65 N.J. 474, 484 (1974)). "Particular deference is afforded to family court fact-finding because of the family courts' special jurisdiction and expertise in family matters." N.J. Div. of Child Prot. & Permanency . v. N.C.M., 438 N.J. Super. 356, 367 (App. Div. 2014) (citing Cesare, 154 N.J. at 413). "We will not overturn a family court's factfindings unless they are so 'wide of the mark' that our intervention is necessary to correct an injustice." N.J. Div. of Youth & Family Servs. v. F.M., 211 N.J. 420, 448 (2012) (quoting N.J. Div. of Youth & Family Servs. v. E.P., 196 N.J. 88, 104 (2008)).

A-1497-18T2

To terminate parental rights on the grounds of the "best interests of the child," the Division must prove, by clear and convincing evidence, the following four prongs under N.J.S.A. 30:4C-15.1(a):

> (1) The child's safety, health, or development has been or will continue to be endangered by the parental relationship;
>
> (2) The parent is unwilling or unable to eliminate the harm facing the child or is unable or unwilling to provide a safe and stable home for the child and the delay of permanent placement will add to the harm. Such harm may include evidence that separating the child from his resource family parents would cause serious and enduring emotional or psychological harm to the child;
>
> (3) The [D]ivision has made reasonable efforts to provide services to help the parent correct the circumstances which led to the child's placement outside the home and the court has considered alternatives to termination of parental rights; and
>
> (4) Termination of parental rights will not do more harm than good.
>
> [N.J.S.A. 30:4C-15.1(a); see also N.J. Div. of Youth & Family Servs. v. A.W., 103 N.J. 591, 604-11 (1986) (reciting the four standards later codified in Title 30).]

The four statutory prongs "are neither discrete nor separate. They overlap to provide a composite picture of what may be necessary to advance the best interests of the children." N.J. Div. of Youth & Family Servs. v. M.M., 189 N.J.

261, 280 (2007) (quoting N.J. Div. of Youth & Family Servs. v. F.M., 375 N.J. Super. 235, 258 (App. Div. 2005)).

Under prong one, the Division must demonstrate harm "that threatens the child's health and will likely have continuing deleterious effects on the child." In re Guardianship of K.H.O., 161 N.J. 337, 352 (1999).  The Division need not demonstrate actual harm.  N.J. Div. of Youth & Family Servs. v. A.G., 344 N.J. Super. 418, 440 (App. Div. 2001).  That is, courts consider whether the child's safety, health, or development will be endangered in the future.  Ibid.  Moreover, "[c]ourts need not wait to act until a child is actually irreparably impaired by parental inattention or neglect."  In re Guardianship of D.M.H., 161 N.J. 365, 383 (1999) (citing A.W., 103 N.J. at 616 n.14).

In addition, a parent's failure to provide "a permanent, safe, and stable home" engenders significant harm to the child.  Ibid.  Likewise, a parent's failure to provide "solicitude, nurture, and care for an extended period of time is in itself a harm that endangers the health and development of the child."  Id. at 379.

"The second prong, in many ways, addresses considerations touched on in prong one."  F.M., 211 N.J. at 451.  The focus is on "parental unfitness."  K.H.O., 161 N.J. at 352.

Under prong three, the Division must prove it "made reasonable efforts to provide services to help the parent correct the circumstances which led to the child's placement outside the home." N.J.S.A. 30:4C-15.1(a)(3). Reasonable efforts is defined as "attempts by an agency authorized by the [D]ivision to assist the parents in remedying the circumstances and conditions that led to the placement of the child and in reinforcing the family structure." N.J.S.A. 30:4C-15.1(c). The record must also establish "the court has considered alternatives to termination of parental rights." N.J.S.A. 30:4C-15.1(a)(3).

Under the fourth prong, the Division must demonstrate that "[t]ermination of parental rights will not do more harm than good." N.J.S.A. 30:4C-15(a)(4). The fourth prong serves as a "'fail safe' inquiry guarding against an inappropriate or premature termination of parental rights." F.M., 211 N.J. at 453.

III.

A.

We affirm the trial court's decision with respect to prongs one and two of the statute substantially for the reasons expressed in the trial court's extensive oral decision issued on November 15, 2018. We add the following comments.

The trial court's factual findings and conclusions as to prongs one and two are fully supported by the record. The record clearly established J.L. is unable

16

to care for Maya's significant special needs.  J.L.'s limitations engender significant harm to Maya as J.L. is unable to provide a "permanent, safe, and stable home."  D.M.H., 161 N.J. at 383.

As to prong one, the trial court emphasized Maya "needs extraordinary, unusual, virtually around the clock care."  The court found the testimony consistently and "strongly indicate[d] that [J.L.] is unable . . . to meet the extraordinary needs" of Maya.  The court noted J.L. missed doctor appointments and cited credible testimony about J.L. not fully comprehending the nature of Maya's medical condition.  The court also credited Dr. Lessin's opinion that J.L. could not independently parent Maya and that termination would be appropriate in this matter.  Additionally, the court considered J.L.'s absence for three months, her marijuana use, recent relapse, and her relationship with L.Y.  Based on these findings, the court determined reunification with Jen would "pose a substantial risk" to Maya.

As to the second prong, the trial court again credited Dr. Lessin's opinion concerning J.L.'s inability to prioritize her parental responsibilities and her lack of understanding of Maya's special needs.  The court gave weight to Dr. Lessin's testimony that J.L. had not shown any progress, suggesting an ability to independently parent Maya now or in the future.  The court noted Dr. Lessin's

17

testimony regarding the importance of permanency to a child in Maya's position; otherwise Maya is subject to fear and anxiety. The court found a delay in permanent placement would add to Maya's harm.

B.

Turning to prong three, we are satisfied the record fully supports the trial court's finding that the Division made "reasonable efforts" to provide appropriate services to both parents. The Division engaged in such efforts for almost two years—assisting J.L. with her substance abuse, providing counseling, and arranging visitation—to reunite Maya with J.L. As we have noted, the parents participated in many of those services, albeit inconsistently and without success.

The last clause of prong three addresses whether "the court has considered alternatives to termination of parental rights." N.J.S.A. 30:4C-15.1(a)(3). The trial court noted Nia has fostered sixty-four children, including thirty-five medically fragile children, and has special training in how to do so. It concluded that given Nia's "experience, history and capability," "her willingness to adopt" Maya, and "her willingness to allow contact to continue between" J.L. and Maya, "there really is no alternative . . . other than termination of parental rights

18

followed by adoption." The trial court approved the Division's plan to have Nia adopt Maya.

That said, our review of the record reveals the Division did not show Nia was informed about the KLG option. Rimer testified she did not "believe" any discussions arose concerning KLG. Nor did the trial court address KLG in its decision.[3]

J.L. argues the trial court erred by "overlook[ing] the viable alternative of fashioning a kinship legal guardianship arrangement that would allow [Maya] to receive the trained care of her paternal grandmother while allowing her legal relationship with her mother to remain intact." Citing M.M., J.L. contends the Division should have informed Nia about the KLG option before receiving her "unequivocal" decision to adopt Maya. Because the Division failed to do so, J.L. argues it did not satisfy prong three.

The purpose of KLG "is to address the needs of children who cannot reside with their parents due to their parents' incapacity or inability to raise them and when adoption is neither feasible nor likely." N.J. Div. of Youth & Family Servs. v. S.F., 392 N.J. Super. 201, 209 (2007). KLG is a potential alternative

---

[3] We recognize that the trial court's decision was issued several months before our opinion in M.M. was published.

to termination of parental rights.  <u>M.M.</u>, 459 N.J. Super. at 259.  In that regard, the Legislature declared, "[i]n considering kinship legal guardianship, the State is seeking to add another, alternative, permanent placement option, beyond custody, without rising to the level of termination of parental rights, for caregivers in relationships where adoption is neither feasible nor likely." N.J.S.A. 3B:12A-1(c).  As we explained in <u>M.M.</u>:

> The Legislature has made it clear that relative caretakers who might be candidates for KLG must be adequately informed of the nature of such arrangements and the financial and other services for which they may be eligible.  To achieve that objective, the Legislature enacted in 2005 the Kinship Legal Guardianship Notification Act ("Notification Act"), N.J.S.A. 30:4C-89 to -92.  In the Act, the Legislature imposed a responsibility upon the State "to ensure that individuals who may be eligible to become kinship legal guardians are aware of the eligibility requirements for, and the responsibilities of, kinship legal guardianship and . . . [also] the services available to kinship legal guardians in the State."  N.J.S.A. 30:4C-90(e).
>
> To implement this notification mandate:
>
> The Department of Children and Families shall, in easily understandable language:
>
> (a) inform individuals, of whom the department is aware, who may be eligible to become kinship legal guardians of:

(1) the eligibility requirements for, and the responsibilities of, kinship legal guardianship; and

(2) the full-range of services for which kinship legal guardians may be eligible and the eligibility requirements for those services; and

b. inform current kinship legal guardians of the full-range of services for which kinship legal guardians may be eligible and the eligibility requirements for those services.

[N.J.S.A. 30:4C-91.]

[M.M., 459 N.J. Super. at 261 (alterations in original) (footnote omitted).]

In M.M., we discussed the issue of KLG being "appropriate only if 'adoption of the child is neither feasible nor likely.'" Id. at 262 (quoting N.J.S.A. 3B:12A-6(d)(3)(b)). We concluded that "[a] logical implication of the Notification Act is that the caregiver must be fully informed of the potential benefits and burdens of KLG before deciding whether he or she wishes to adopt." Id. at 263. We analogized this "paradigm" to the principles of informed consent and informed refusal in healthcare. Ibid. "[W]e construe[d] the KLG statute and the Notification Act to make a caregiver's preference, if any, of KLG over adoption a relevant but not dispositive consideration." Id. at 264. We

concluded that "[t]he caregiver's consent to adopt should be not only be informed, but also unconditional, unambiguous, and unqualified." Ibid.

The record does not demonstrate that KLG was discussed with Nia. As in M.M., we cannot determine from the present record, by a level of clear and convincing evidence, whether Nia's consent to adopt Maya was informed and if she is "committed unambiguously, unequivocally, and unconditionally to adoption, regardless of the possible alternative of KLG." Id. at 273.

We therefore remand this matter "for further proceedings to develop the record more definitively" on the KLG and adoption issue and for the trial court to render "explicit associated findings of fact and conclusions of law." Id. at 275. The trial court shall, in its discretion, determine the appropriate forms of proof at the remand hearing.

## C.

Finally, we address the fourth prong. The trial court credited Dr. Lessin's testimony regarding the bonding evaluation. The court noted it was not known if Maya "will ever be able to form typical relationships in the future because of her limitations." Dr. Lessen concluded that Maya's profound limitations precluded conventional application of a bonding evaluation. Nevertheless, the court noted Dr. Lessen "was not able to observe any attachment on the part of

[Maya] toward [J.L.]." Dr. Lessen opined that Maya is so dependent on her day-to-day needs, "meetings those needs is paramount with the equivalent to a bond." The court agreed with Dr. Lessen's opinion that "termination of parental rights in this case would not do more harm than good because of [J.L.'s] inability to provide the day-to-day care that [Maya] needs." The court reiterated that the paternal grandmother is willing to adopt Maya and qualified to meet her day-to-day demands.

Subject to the outcome of the remand hearing, we conclude the trial court provided a reasonable basis for its conclusion on prong four that the termination of J.L.'s parental rights will not do Maya more harm than good under N.J.S.A. 30:4C-15.1(a)(4).

## IV.

J.L.'s remaining argument lacks sufficient merit to warrant discussion in a written opinion. R. 2:11-3(e)(1)(E).

Affirmed in part and remanded in part for further proceedings consistent with this opinion. The remand shall be completed within ninety days, unless that deadline is reasonably extended by the trial court with the consent of counsel. We do not retain jurisdiction.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

A-1497-18T2