# RECORD IMPOUNDED

**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NOS. A-5191-17T4
               A-5192-17T4[1]

NEW JERSEY DIVISION
OF CHILD PROTECTION
AND PERMANENCY,

      Plaintiff-Respondent,

v.

T.T. and M.T.,

      Defendants-Appellants.

_____

IN THE MATTER OF THE
GUARDIANSHIP OF H.T.,

      a Minor.

_____

Submitted March 12, 2020 – Decided May 4, 2020

Before Judges Suter and DeAlmeida.

---

[1] The cases were consolidated on appeal in order to share transcripts and to permit a single responding brief.

On appeal from the Superior Court of New Jersey, Chancery Division, Family Part, Sussex County, Docket No. FG-19-0023-17.

Joseph E. Krakora, Public Defender, attorney for appellant T.T. (Robyn A. Veasey, Deputy Public Defender, of counsel; Lora B. Glick, Designated Counsel, on the brief).

Joseph E. Krakora, Public Defender, attorney for appellant M.T. (Robyn A. Veasey, Deputy Public Defender, of counsel; Daniel Anthony Di Lella, Designated Counsel, on the briefs).

Gurbir S. Grewal, Attorney General, attorney for respondent (Sookie Bae, Assistant Attorney General, of counsel; Peter Damian Alvino, Deputy Attorney General, on the brief).

Joseph E. Krakora, Public Defender, Law Guardian, attorney for minor (Lisa Marie Black, Designated Counsel, on the brief).

PER CURIAM

Defendants T.T.[2] (Tanya) and M.T. (Malcolm) appeal the judgment of guardianship terminating their parental rights to H.T. (Hope) under N.J.S.A. 30:4C-12. They contend the Division of Child Protection and Permanency (Division) did not prove by clear and convincing evidence that their parental rights should be terminated. We affirm.

---

[2] We use fictitious names to protect the confidentiality of the family members and child. R. 1:38-3(d)(12).

## I.

Tanya and Malcolm are the biological parents of Hope, who was born in December 2008. Tanya has two other children, K.C. and S.C., with another father. K.C. was placed in the care of her father and S.C. was placed in resource and institutional homes. Both children now are adults.

This appeal is from a judgment of guardianship entered after a bench trial terminating Tanya and Malcolm's parental rights to Hope. At trial, the caseworker supervisor testified about the Division's involvement with Tanya and the services provided to both parents relative to their parenting of Hope. Dr. Janet Cahill testified about Tanya's psychological issues and the harm she continued to cause Hope as well as Malcolm's inability to intercede to protect Hope. Tanya and Malcolm testified in opposition to termination of their parental rights. The trial court's judgment terminating parental rights was supported by substantial credible evidence and satisfied each prong of the statutory test with clear and convincing evidence.

The facts are adduced from the evidence admitted at the termination of parental rights trial. In 2000, the Audrey Hepburn Children's House Diagnostic Center (AHCH) diagnosed Tanya's conduct as "consistent with components that define[]" Factitious Disorder Imposed on Another (FDIA), formerly known as

A-5191-17T4

Munchausen Syndrome by Proxy.  A parent with FDIA, fabricates his or her child's "symptoms and/or induction of signs of disease, leading to unnecessary investigations and interventions, with occasional serious health consequences, including death of the child."  Stedman's Medical Dictionary 1906 (28th ed. 2005).  Tanya's diagnosis was based on how she treated her son, S.C. as a child.  She complained he suffered from a host of ailments including Tourette's syndrome, auditory processing impairments, incontinence, seizures, bipolar disorder, depression, obsessive-compulsive disorder (OCD), Asperger's syndrome, oppositional defiant disorder (ODD), back and leg pain, and attention deficit hyperactivity disorder (ADHD).  The AHCH recommended "intense individual psychotherapy" for Tanya but it is not clear if she obtained treatment.

When Hope was born in 2008, medical at the hospital were concerned with Tanya's mental health and contacted the Division.  Over the next few years, the Division investigated a number of referrals[3] and provided services for Tanya and Malcolm.

In March 2015, Tanya called the Division complaining she could not "take her daughter anymore."  The Division's investigation revealed that since May

---

[3]  From 1992 to 2015, there were seventy-two referrals made about the family including allegations involving physical abuse, domestic violence, parental mental illness and homelessness.

2014, Malcolm was living in the family's van in the driveway because Tanya said he had been verbally aggressive and had squeezed Hope's arm—a fact he did not deny. The Division re-opened its case to provide services.

In May 2015, when Hope was six years old, Tanya and Malcolm did not meet Hope at the bus stop and could not be located. Her school contacted the police, which contacted the Division. Hope was placed in a resource home pursuant to a Dodd[4] emergency removal order after she said she did not have any family or friends who could take care of her. Later that night, Tanya and Malcolm arrived at the police station, explaining they had been looking for an apartment, became lost and ran out of gas, twice. They had not called or asked anyone to take care of Hope.

The Division filed an order to show cause and verified complaint under N.J.S.A. 9:6-8.21 seeking custody, care and supervision of Hope. Following a hearing on the emergency removal, the trial court returned custody to Tanya and Malcolm, but ordered them to submit to psychiatric and psychological evaluations. They were to participate in short-term family preservation services.

Hope's school records showed she was absent a total of eighty-one days in kindergarten; most of the absences were unexcused. Hope's pediatrician had

---

[4] See N.J.S.A. 9:6-8.29.

diagnosed her with ADHD and ODD, but she had not been evaluated by a neurologist. Throughout visits in 2015, Tanya asserted to caseworkers that Hope was physically ill; she disparaged Malcolm, referring to him as a "monster" and that she did not want him around Hope. She mentioned that another child was "still with them" even though that child had been stillborn. Division caseworkers had difficulty contacting the family and left several messages at the residence. When contact was made, Tanya was verbally hostile to the caseworker.

Janet Cahill, Ph.D., issued a preliminary parenting capacity evaluation on August 7, 2015, finding that Tanya satisfied the criteria for FDIA. Many of the reasons Hope had missed school were based on symptoms only Tanya reported—such as fevers, diarrhea, vomiting and headaches. Dr. Cahill recommended a separation test where Hope would be separated from both parents for a six to eight-week period in order to see if the child's symptoms persisted without the caregiver. Dr. Cahill recommended against any visitation with Hope by Tanya and Malcolm.

Hope was removed in August 2015, for the separation test and placed in custody of the Division and in a resource home. Parental visitation was suspended. Dr. Cahill issued a final report in October 2015 recommending that

6

Hope remain in the resource home without any contact by Tanya because of her exaggerations of Hope's problems and behaviors. She recommended Tanya see a therapist specializing in FDIA.

In November 2015, the trial court ordered Tanya to attend therapy to address issues identified by Dr. Cahill in her report, ordered a neurology examination for Hope to follow up on ODD and ADHD diagnoses, and ordered weekly therapeutic supervised visitation for Malcolm with Hope. Tanya's visitation continued to be suspended.

Tanya and Malcolm were evicted in December 2015. Tanya refused to give the Division an address, advising they were "here and there." Tanya reported that she and Malcolm were no longer a couple.

Malcolm was allowed supervised therapeutic visitation with Hope, but wanted the visits to include Tanya. However, Tanya was ordered to engage in therapy before she could be considered for visitation, and she had not done so.

The Division asked Tanya for the names of relatives with whom Hope could be placed, but Tanya she did not want Hope to live with her grandmother and "would have to give it some thought." Although asked to provide names for the next meeting, she never did so.

A-5191-17T4

In January 2016, Hope was displaying some negative behaviors at the resource home and in school. Dr. Cahill testified this was not validation of Tanya's claims about the child, but was behavior she had seen previously when permanency was not resolved. The Division implemented therapy and mentoring for Hope.

Because Malcolm had limited English language skills, the Division arranged counseling for him with an Arabic-speaking therapist. That therapist concluded Malcolm "lacked insight into [Tanya's] mental health difficulties" and would have difficulty gaining insight about that issue. "[T]he prognosis for change [was] poor[.]"

By May 2016, Tanya reported she and Malcolm were a couple again. Tanya began therapy with Jessica Platt, Ph.D., for FDIA, although she denied suffering from it. She attended three sessions and stopped because it was a "waste [of] her time."

In June 2016, Tanya again advised the Division she did not have contact with her family and "knew they would not care for [Hope] for her." By this time, Hope was in a new resource home with parents interested in adopting her.

The trial court approved the Division's permanency goal of termination of parental rights. It also approved a concurrent goal of reunification with Malcolm only.

Malcolm began therapeutic supervised visitation with Hope in September 2016, but it was suspended after a few weeks because Hope was showing behavioral problems at home and in school. Against the court order that prohibited contact between Tanya and Hope, Malcolm had brought notes and gifts from Tanya to his visits with Hope. Hope's behavior improved after the visitation was stopped.

In September 2016, the Division filed a complaint to terminate Tanya's and Malcolm's parental rights to Hope under N.J.S.A. 30:4C-15.[5] Tanya also resumed therapy with Dr. Platt in September 2016, but by January 2017, the doctor reported Tanya showed "no insight and continued denial regarding FDIA."

---

[5] In November 2016, the trial court entered an order, following a hearing, that Hope was abused and neglected by Tanya under N.J.S.A. 9:6-8.21 (Title Nine) based on the number of Hope's excused absences from kindergarten. However, Malcolm was not found to have committed child abuse or neglect on that basis. We affirmed that order in New Jersey Division of Child Protection and Permanency v. T.T., No. A-1503-16 (App. Div. Dec. 20, 2018) (slip op. at 2). A second permanency hearing was held in 2017, where the goal remained termination of parental rights.

Dr. Cahill's updated parenting capacity report concluded Tanya and Malcom were not viable custodial parents for Hope and that the prognosis was poor for the future. In Dr. Cahill's opinion, Malcolm continued not to recognize the harm posed to Hope by Tanya and did not protect Hope. This was evidenced in part by his unwillingness to see Hope for a year without Tanya. Dr. Cahill's report concluded that Tanya placed Hope at direct and substantial risk of harm. Dr. Cahill noted that others did not see the behavior or medical concerns that Tanya reported about Hope. Tanya was treating Hope much the same as she had treated S.C. by exaggerating behavioral and medical issues and by isolating the child. Dr. Cahill viewed Tanya as needing to be in control of everyone— including Hope and Malcolm—and that all of this was consistent with the diagnosis of FDIA. Tanya told Dr. Cahill that she "would not do anything differently" if she regained custody. Dr. Cahill opined it was not in Hope's best interest to return her to her parents' custody because they denied having done anything wrong. In Dr. Cahill's opinion, FDIA "is both a mental illness and a form of child abuse."

Dr. Cahill conducted a bonding evaluation between Hope and her resource parents, providing a positive review. They were committed to adoption, which

was a goal Dr. Cahill endorsed.  She did not conduct a bonding evaluation with Tanya or Malcolm and Hope.

By December 2016, Tanya and Malcolm continued to present themselves as a couple and wanted to reunite with Hope.  However, Tanya's therapist advised the Division that Tanya had not "gained any insight into the reasons for the Division's involvement."  Malcolm's therapist said that Malcolm did not have "insight into the neglect factors that he and [Tanya] presented."

Hope was making progress.  An individualized education plan was implemented.  The resource family wanted to adopt Hope and were addressing her behavioral issues.

Malcolm's supervised therapeutic visitation resumed in March 2017, but he continued to bring gifts for Hope from Tanya including cards with lipstick kisses, peeled off nail polish, and nail clippings.  According to the resource parents, Hope would be "a bit defiant" after visits with her father.

Malcolm's therapist reported in June 2017, that Malcolm wanted Hope at home, but was not pursuing custody without Tanya.  Tanya and Malcolm requested the Division arrange couples counseling.  By June 2017, Tanya acknowledged to Dr. Platt that some of her parenting behavior was "connected to deeper emotional issues relat[ed] to her past and trauma issues."

A-5191-17T4

The guardianship trial was conducted in October and November 2017. Dr. Cahill testified as an expert in psychology, parental fitness and evaluation, bonding and FDIA. Consistent with her reports, she testified FDIA was a form of child abuse causing children to have unnecessary medical treatment, become isolated from other children and suffer developmental setbacks. She noted Tanya's parenting of Hope was similar to how she treated S.C. Dr. Cahill testified that Tanya's long-standing behavior posed a risk of harm to Hope in the future. In her opinion, Malcolm was "extremely dependent" on Tanya. He did not see a mental health problem with Tanya or that she had done anything wrong.

Dr. Cahill did not recommend that Hope be returned to Tanya because Tanya had always insisted she did nothing wrong, which placed the child at substantial risk of harm. Dr. Cahill testified Malcolm had shown he would choose Tanya's needs over Hope's. Also, he had not shown an inclination to parent Hope without Tanya.

Dr. Cahill testified the resource parents had insight into Hope's needs and were able to pursue the services she needed. It was Dr. Cahill's opinion the resource parents could mitigate any harm to Hope from termination of her parents' rights to her.

Kelly Weymer, a Division family service specialist and supervisor, testified that Tanya and Malcolm went back and forth about whether they were a couple, but that Malcolm was clear he did not intend to parent Hope without Tanya. Neither parent suggested the names of other relatives as alternatives for Hope. Weymer also testified Hope was not diagnosed at that time with ADHD or other medical or psychological conditions.

Tanya testified Hope suffered from ADHD and auditory processing issues. She advised the court Malcolm and she were going to divorce although she felt it was better if Hope was raised by both parents. She would not be involved if the court ordered Hope returned to Malcolm exclusively. In Tanya's view, if necessary, Malcolm could raise Hope by himself.

Malcolm testified he saw no problem with Tanya's care of Hope in the past, was no longer in therapy and insisted it was his decision to live in the van. Malcolm acknowledged Hope had missed a number of days of school, but claimed she was frequently ill. Malcolm was willing to be Hope's sole parent if need be, but that was not his "first choice." He also testified he would abide by a court order not to allow Tanya to have contact with Hope. In the past, he misunderstood he was not allowed to bring gifts to Hope from Tanya during visits.

13

On June 27, 2018, the trial court terminated Tanya's and Malcolm's parental rights. The court found Dr. Cahill and Weymer's testimony to be credible. Tanya's testimony, however, was "wandering and rambling" and "significantly at odds with the Division records." Malcolm "made materially inconsistent statements" in his testimony. The trial court concluded the Division had proven each prong under N.J.S.A. 30:4C-15.1 by clear and convincing evidence.

Under prong one the trial court found both parents harmed Hope. Tanya "continued a pattern of negative parenting which included transience, exposure to domestic disputes, and the mischaracterizations and amplification of [Hope's] . . . so-called illnesses. Despite attempts at intervention, [Tanya] remained hostile, confrontational and lacked the insight to therapeutically address her issues." Her mental illness impaired her ability to parent, and when "coupled with the near certainty that it will be untreated in the future," this posed the risk of serious harm to Hope. Despite therapy, Tanya never gained the insight that her behavior was maltreatment.

The trial court found Malcolm did not protect Hope from Tanya. He actually withdrew his "solicitude, nurturance and care" from Hope by not visiting when Tanya could not. When he did visit, Malcolm brought notes and

other gifts from Tanya.  If he had sole custody, Malcolm wanted the family to live together  even if he and Tanya were not in a relationship, not recognizing this would expose Hope to harm.

Under prong two, the trial court found Tanya had "a long history of mental health issues, unstable housing, lack of employment and poor judgment."  Her mental health issues and FDIA diagnosis extended for more than twenty years; Tanya's treatment of S.C. and Hope was similar.  Tanya did not achieve stability during the course of the Division's involvement, and had no plan to address these issues in the future.

Malcolm did not provide stable housing for Hope, did not recognize the severity of Tanya's mental health issues and has not protected Hope.  He showed no improvement after services were provided.  Malcom was not able to put Hope's needs ahead of his own.

Under prong three, the trial court found the Division made reasonable efforts to assist the family and to explore alternatives to termination.  Tanya was provided therapy for FDIA, although she initially refused to attend because she disagreed with the diagnosis.  Based on Dr. Platt's report, Tanya "never gained insight into her diagnosis and never wavered in her disagreement with the diagnosis of FDIA."  Malcolm did not visit Hope for nearly a year because he

disagreed with Tanya's lack of participation. Even when he began supervised visitation, he brought gifts from Tanya. Despite individual counseling, Malcolm still had "no insights regarding the reasons for the removal" or Tanya's mental health condition. The Division provided other services including transportation, parenting and caretaker education and assistance, domestic violence counseling, housing assistance, and psychiatric and psychological evaluations and treatment. Division workers asked for the names of any relatives and were not given any.

Under prong four, the trial court concluded termination of parental rights would not do more harm than good. Neither parent "demonstrated the stability and judgment necessary to care for the child." Neither parent gained any insight into their behavior. In contrast, the resource family is "responsibly committed to [Hope's] adoption and [has] the ability to mitigate the harms previously committed by her parents and any future issues that may arise." The bonding evaluation found no evidence Hope would suffer an "enduring risk of [harm]" if she had no contact with Tanya and Malcolm.

On appeal, Tanya argues the trial court misapplied case law and made findings of fact that cannot be "reconciled" with the record. Further, she claims the trial court erred because the Division did not contact and assess Hope's

relatives for possible placement. Tanya also contends the trial court misapplied precedent by not requiring comparative bonding evaluations of her and Malcolm.

Malcolm argues the trial court erred because there was not clear or convincing evidence for any of the four prongs under N.J.S.A. 30:4C-15.1(a) and the evidence did not support the finding that Hope's safety, health or development would be harmed. He was willing to raise Hope without Tanya, therefore, the trial court erred by finding he was unwilling or unable to eliminate the harms facing Hope. Malcom also argues the trial court erred because the Division provided him with insufficient services. Finally, he contends there was not clear and convincing evidence that termination of parental rights would not do more harm than good.

## II.

N.J.S.A. 30:4C-15.1(a) authorizes the Division to petition for the termination of parental rights in the "best interests of the child" if the following standards are met:

> (1) The child's safety, health, or development has been or will continue to be endangered by the parental relationship;

> (2) The parent is unwilling or unable to eliminate the harm facing the child or is unable or unwilling to

provide a safe and stable home for the child and the delay of permanent placement will add to the harm. Such harm may include evidence that separating the child from his resource family parents would cause serious and enduring emotional or psychological harm to the child;

(3) The division has made reasonable efforts to provide services to help the parent correct the circumstances which led to the child's placement outside the home and the court has considered alternatives to termination of parental rights; and

(4) Termination of parental rights will not do more harm than good.

A trial court's decision to terminate parental rights is subject to limited appellate review. N.J. Div. of Youth & Family Servs. v. G.L., 191 N.J. 596, 605 (2007); see Cesare v. Cesare, 154 N.J. 394, 413 (1998) ("Because of the family courts' special . . . expertise in family matters, appellate courts should accord deference to family court factfinding."). The family court's decision to terminate parental rights will not be disturbed "when there is substantial credible evidence in the record to support the court's findings." N.J. Div. of Youth & Family Servs. v. E.P., 196 N.J. 88, 104 (2008).

## A.

There was substantial credible evidence to support the trial court's findings that Hope was harmed by both parents. Tanya kept Hope out of

kindergarten for eighty-one days largely without doctors' notes. The school journal entries that Tanya prepared listed negative behaviors and illnesses that others did not observe to the extent she claimed. Tanya was diagnosed in 2000 as suffering from FDIA, but rejected this diagnosis, and refused treatment for years. When she did undertake therapy with Dr. Platt, Tanya had little insight into her condition and disagreed that it applied to her.

Despite Tanya's asserted breakthrough in treatment, there is no evidence she accepted the FDIA diagnosis or its effect on her parenting. There is no question that "a psychiatric disability can render a parent incapable of caring for his or her children." N.J. Div. of Youth & Family Servs. v. I.Y.A., 400 N.J. Super. 77, 94 (App. Div. 2008). This is so even if parents are otherwise "morally blameless . . . ." N.J. Div. of Youth & Family Servs. v. A.G., 344 N.J. Super. 418, 438 (App. Div. 2001).

Here, Dr. Cahill, diagnosed Tanya with FDIA, which involves harming another by claiming that person has illnesses he or she does not, and/or by exaggerating the person's symptoms. The judge found Dr. Cahill's testimony to be credible. Tanya's exaggeration of Hope's symptoms, keeping her out of school, limiting her diet and restricting her interactions with other children were

all harmful. Defendants provided no expert testimony to refute Dr. Cahill's opinions.

The trial court did not err in finding sufficient credible evidence that Malcom harmed Hope; he never intervened to protect her from Tanya. See Div. of Youth & Family Servs. v. F.M., 211 N.J. 420, 450-51 (2012) (holding that one parent's failure to protect a child from the injurious behavior of the other was enough for a finding under prong one); see also Div. of Youth & Family Servs. v. M.M., 189 N.J. 261, 281-91 (2007).

Malcolm has no insight into Tanya's mental health issues or his own. He claimed he was divorcing Tanya and would raise Hope by himself, contrary to his past behavior where he capitulated to Tanya's demands to the extent he lived for a time in a van in the driveway of their home. When he did visit Hope—after nearly a year—he brought disturbing gifts from Tanya, including peeled-off nail polish and fingernail clippings, and notes signed on behalf of a stillborn child, who died years before. It would have been wishful thinking—without any evidential support—to find that Malcolm would block contact from Tanya with Hope. The court found Malcolm remained without insight into Tanya's mental health issues or his own and because of that he never provided "any type of a plan for a permanent, safe and stable home" for Hope.

This had nothing to do with "cultural differences" as Malcolm argues on appeal. It was Tanya's care for Hope that posed a substantial risk of harm; he did not explain how cultural differences prevented him from grasping that risk.

### B.

The trial court did not err in finding that Tanya and Malcolm either were unable or unwilling to correct the harms they inflicted. Under prong two, the Division must show a parent is unable or unwilling to correct the circumstances that led to the Division's involvement. In re Guardianship of K.H.O., 161 N.J. 337, 348-49 (1999). "The question is whether the parent can become fit in time to meet the needs of the child." N.J. Div. of Youth & Family Servs. v. T.S., 417 N.J. Super. 228, 244 (App. Div. 2010).

Tanya claims on appeal that she had a breakthrough in therapy, but there was no acknowledgment by her she suffers from FDIA. Instead, Tanya contends Hope really does suffer from the things that Tanya claimed. In her brief, she argues Hope "was diagnosed with ADHD by her pediatrician in March 2015" and showed "aggressive and defiant behaviors" in school and in her resource homes post-removal. None of this contradicts Dr. Cahill's opinion that Tanya lacks insight into her FDIA diagnosis and will not achieve such insight within

the foreseeable future. Therefore, the trial court did not err by finding Tanya could not correct the harms she caused Hope.

Malcolm argues the court failed to consider under prong two whether he would or could parent Hope without Tanya. Even though he claims he would follow the court's order that Tanya not have contact with Hope, he never attempted to parent Hope without Tanya, and enabled her contact with Hope. The trial court's finding under prong two that Malcolm would not correct the harm to Hope is supported by his lack of understanding into the problems that caused removal.

## C.

Both parents argue the trial court erred by finding the Division satisfied prong three under N.J.S.A. 30:4C-15.1. Tanya claims the Division did not determine if there were other placement options for Hope, particularly with her relatives.

Under N.J.S.A. 30:4C-12.1(a), when the Division takes custody of a child, it must "initiate a search for relatives who may be willing and able to provide the care and support required by" that child. Tanya contends for the first time on appeal that the Division's November 2000 file from when S.C.'s case was active listed contact information for some of Tanya's relatives. However, we

22

find no error in the trial court's conclusion that prong three was satisfied. From 2015 through and including trial, Tanya never identified placement options for Hope. To the contrary, she told caseworkers she "[did] not have any contact with" her family. Malcolm's relatives were in Morocco and he did not suggest options for placement. The Division did leave phone messages that were not returned, and some of the numbers on file were no longer in service. Tanya and Malcolm's lack of cooperation in identifying alternatives comported with their non-acceptance of the reasons for removal.

Malcolm argues he was not provided with adequate services because he was abused by Tanya. "[A]n evaluation of the efforts undertaken by [DCPP] to reunite a particular family must be done on an individualized basis." In re Guardianship of D.M.H., 161 N.J. 365, 390 (1999). "'Reasonable efforts' will vary depending upon the circumstances" of the child's removal. N.J. Div. of Youth & Family Servs. v F.H., 389 N.J. Super. 576, 620 (quoting A.G., 344 N.J. Super. at 437). Nevertheless, "[t]he diligence of [DCPP's] efforts on behalf of a parent is not measured by their success," D.M.H., 161 N.J. at 393, particularly where the lack thereof is due to a parent's "failure to cooperate or follow through" with services and obligations. N.J. Div. of Youth & Family Servs. v. C.S., 367 N.J. Super. 76, 119 (App. Div. 2004).

A-5191-17T4

We agree with the trial court that the record shows Malcolm received therapy, visitation, a cell phone, transportation assistance, psychological evaluations, case worker visits, phone contacts, offers of family team meetings, referrals to services for parenting classes and participation with DECIDE.[6] There is no indication his individual therapist recommended any alternative therapy for Malcolm. The trial court did not err by finding this prong was satisfied.

## D.

Tanya and Malcolm contend the trial court erred by finding termination would not do more harm than good. They assert the trial court should have required bonding evaluations for themselves and Hope; the only bonding evaluation was between Hope and the resource parents.

In evaluating prong four, the trial court must balance the child's relationships with her birth and resource parents and determine whether she will suffer greater harm from the termination of ties with the former than with the latter. In re Guardianship of J.N.H., 172 N.J. 440, 478 (2002). Prong four does not require that "no harm will befall the child as a result of the severing of biological ties." K.H.O., 161 N.J. at 355. A court must consider "the child's

_____

[6] This is a program for domestic violence offenders.

age, her overall health and development, and the realistic likelihood that the [natural] parent will be capable of caring for the child in the near future." Id. at 357.

We agree there was substantial evidence to support the trial court's finding there was "no realistic likelihood" either defendant would be able to safely care for Hope in the foreseeable future. Neither party gained insight into the problems that resulted in Hope's removal or how to address the issues. Hope was bonded with her resource parents, who want to adopt her. The expert opined that the resource parents could address the harm resulting from termination. In this circumstance, it is the relationship with the parents that is harmful. Given both parents' lack insight about Tanya's mental health, the trial court did not err by accepting Dr. Cahill's recommendation against a bonding evaluation.

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION